No. 99,536

WOLFE ELECTRIC, INC., *Appellee*, v. TERRY J. DUCKWORTH and
GLOBAL COOKING SYSTEMS, LLC, *Appellants*.

(266 P.3d 516)

Opinion filed October 21, 2011.

*Christopher M. McHugh*, of Joseph & Hollander, P.A., of Wichita, argued the cause and was on the briefs for appellants.

*Tim J. Moore*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: This case concerns a dispute between a manufacturer of conveyor pizza ovens, Wolfe Electric, Inc. (Wolfe Electric), and

its former employee, Terry Duckworth, together with the competing business Duckworth helped form, Global Cooking Systems, LLC (Global). Wolfe Electric brought suit against both for misappropriation of trade secrets under the Kansas Uniform Trade Secrets Act (KUTSA), K.S.A. 60-3320 *et seq*. Wolfe Electric also separately alleged Duckworth breached his fiduciary duty and his employment contract, while allegedly Global also tortiously interfered with Duckworth's employment contract.

A jury found for Wolfe Electric on all causes of action, awarding damages in a variety of categories. After trial the court awarded Wolfe Electric attorney fees and permanently enjoined defendants from involvement in commercial pizza ovens for 4 years. We transferred defendants' appeal from the Court of Appeals pursuant to K.S.A. 20-3018(c).

Between them, Duckworth and Global appeal on 11 grounds, which we consolidate for analysis. Multiple erroneous jury instructions and a verdict that fails to specify which of the innumerable acts alleged actually caused which of the particular damages awarded—which otherwise would perhaps allow us to salvage part of the verdict—require us to reverse and remand.

## FACTS

Wolfe Electric is a Wichita business that manufactures conveyor pizza ovens. Ron Wolfe served as the CEO of Wolfe Electric, and his brother, Gary Wolfe, was one of its engineers.

Wolfe Electric hired defendant Duckworth as a human resources consultant in 2003. In early 2004, Duckworth and Ron Wolfe discussed the possibility of Duckworth serving as president. Wolfe Electric's attorney drafted an employment contract, which Duckworth signed. Duckworth then began his work as president.

The contract included Paragraph 7 entitled "Restrictive Covenant and Nondisclosure of Information." Subparagraph "a" contained Duckworth's acknowledgment of Wolfe Electric's trade secrets, several of which were identified:

"a. Employee agrees that as a necessary part of his employment with Employer, he has access to certain facts and information and data including, but not necessarily limited to, pricing lists; parts and equipment inventory; identity of suppliers

and discount or rebate schedules; names and addresses of customers, both past and current, of Employer; projections of future needs of customers; and like and similar facts, information and data which Employee stipulates and agrees is a trade secret, the same having been gathered, interpreted and maintained by Employer at the sole cost and expense of Employer, over a period of many years."

Subsection "b" contained Duckworth's agreement not to reveal or use Wolfe Electric's trade secrets or classified information after his employment ended:

"b. Employee further stipulates and agrees, upon the same consideration as before, that if for any reasons, whether voluntary or involuntary, and whether with or without cause, his employment with Employer should terminate, he will not reveal to any third person or party whomsoever, or use for his benefit, any of the trade secrets or classified information acquired by him during the term of his employment with Employer."

Subsection "c" contained Duckworth's agreement not to solicit, seek, or obtain certain business from Wolfe Electric's active or inactive customers for 1 year after his employment ended:

"c. Furthermore, and upon the same consideration as before, Employee expressly stipulates and agrees that he shall not solicit, seek or obtain from any active or inactive customers of Employer, any business or trade on his own behalf or on the behalf of any future employer, which said business or trade activity would be competitive of Employer for a period of one (1) year commencing from the date of Employee's termination."

Wolfe Electric expanded. In May 2004, it received $56,000 in revenue; in October 2004, $360,000 in revenue; in December 2004, $786,000. In 2005, Wolfe Electric's yearly revenue exceeded $10 million.

Duckworth's relationship with Wolfe Electric became strained. Between December 2004 and February 2005, Duckworth was reprimanded several times. Finally, on February 7, 2005, he was suspended for 2 days without pay. In a memo to Duckworth, Wolfe claimed that Duckworth had recently made three inappropriate comments. Duckworth denied each of these claims or, at least, disputed Wolfe's characterization of the comments.

The circumstances surrounding Duckworth's departure from Wolfe Electric are largely disputed. In any event, Duckworth's final paycheck compensated him through March 2, 2005.

The next month, April 2005, Duckworth contacted his uncle, Duane Latham, who possessed a Ph.D. in food science and had worked in research and development at Mars, Inc., for almost 30 years. Duckworth also contacted Stuart Gribble, owner of Carlson Products, a metal fabrication company. Together with Jo Latham, Latham's wife, the three men formed Global, a commercial pizza oven manufacturing company.

The four individuals met on April 8-11, 2005, in Dallas, Texas. According to Latham's notes of the meeting, Duckworth would provide knowledge of the pizza business, business knowledge, and organizational skills; Gribble would provide the manufacturing capability, office and building space, contacts, participation in NAFEM (National Association of Food Equipment Manufacturers), banking and accounting, and legal; Duane Latham would provide technical support, research and development, and information about food science; and Jo Latham would provide public relations, training, and sales.

On April 18, they decided to reverse engineer a commercial pizza oven. Duckworth explained they chose to reverse engineer a Wolfe Electric oven, the XLT, because it had no patent protection.

Gribble had already made plans for a booth at the NAFEM trade show in September 2005 in Anaheim, California. According to Latham, he ordered two Wolfe Electric ovens on April 21, 2005, and had them shipped to his daughter in Ohio so competitors would not know what Global was developing. Duckworth, Latham, and Gribble testified that they reverse engineered the oven by taking it apart and creating drawings of all the parts. Three months later, Global had its first oven assembled. They displayed it at the NAFEM trade show in late September.

Pete Goodman, director of sales and equipment development for Domino's Pizza, was at the show. Goodman recognized Duckworth as he passed the Carlson/Global booth, so Goodman stopped to greet him. Duckworth told Goodman he could not talk to him about the oven, but Goodman was welcome to talk to Latham. Global distributed brochures at the show.

After discovering that Global had produced an oven in 3 months, Ron Wolfe suspected that Duckworth had taken Wolfe Electric's

trade secrets and other confidential information to help replicate the oven. Wolfe Electric hired a private investigator to determine what Duckworth was doing at Carlson Products because Wolfe Electric received several calls from vendors indicating that Global was ordering the same parts used in the Wolfe Electric oven.

One of these vendors, Ratliff Metal Spinning (Ratliff), was 1 of 400 vendors possessing the part sought by Global. Ron Wolfe suspected Duckworth knew specifically to call Ratliff because Duckworth had taken Wolfe Electric's vendor list.

In October 2005, Wolfe Electric filed suit against Duckworth claiming he had breached his employment contract with Wolfe Electric, breached his fiduciary duty to it, and misappropriated its trade secrets. In May 2006, Wolfe Electric amended its petition. It now also alleged Global misappropriated Wolfe Electric's trade secrets and committed tortious interference with a contractual relationship by encouraging "Duckworth to divulge Wolfe's Confidential Information and Trade Secrets in material violation of his Employment Agreement."

Duckworth counterclaimed against Wolfe Electric for breach of contract for firing him without cause.

Greatly summarized, during the 3-week jury trial Wolfe Electric alleged that Duckworth and Global had misappropriated eight pieces of information from Wolfe Electric: (1) vendor list; (2) customer list; (3) CAD (computer-aided design) drawings; (4) the oven's Dymondwood handle; (5) electrical components; (6) lifting plates; (7) oven layout; and (8) bill of materials.

Ron Wolfe testified Duckworth had been issued a laptop computer for use as the company's president and had unlimited access to Wolfe Electric's CAD drawings. He believed Duckworth downloaded confidential Wolfe Electric files to an external hard drive the night before Duckworth left the company and deleted all of Wolfe Electric's files and e-mails from the laptop before turning it over to Duckworth's attorney. Wolfe claimed this information was inappropriately used in the development of the Global oven. By contrast, defendants generally contended they engaged in a legitimate reverse engineering of the Wolfe Electric oven to make their own.

The trial court denied dispositive motions by defendants at the close of Wolfe Electric's case and their own. The jury then rejected Duckworth's counterclaim against Wolfe Electric for breach of contract but held Duckworth and Global liable on each of Wolfe Electric's claims. The jury awarded damages as follows:

### Duckworth—Breach of contract

| | |
|---|---|
| Loss of profits from sales | $50,000 |
| Loss of opportunity for sales | $125,000 |
| Loss of trade secrets and confidential business information | $50,000 |
| Loss of good will | $50,000 |
| Loss of market share | $0 |
| Loss of brand and product recognition | $0 |

### Duckworth—Breach of fiduciary duty

(The damages were identical to those awarded for Duckworth's breach of contract.)

| | |
|---|---|
| Loss of profits from sales | $50,000 |
| Loss of opportunity for sales | $125,000 |
| Loss of trade secrets and confidential business information | $50,000 |
| Loss of good will | $50,000 |
| Loss of market share | $0 |
| Loss of brand and product recognition | $0 |

### Duckworth—Misappropriation of trade secrets  $50,000

### Global—Tortious interference

(Except for a line left blank for loss of good will, damage amounts were identical to those assessed against Duckworth for breach of [1] contract and [2] fiduciary duty.)

| | |
|---|---|
| Loss of profits from sales | $50,000 |
| Loss of opportunity for sales | $125,000 |
| Loss of trade secrets and confidential information | $50,000 |
| Loss of good will | $0 |
| Loss of market share | $0 |
| Loss of brand and product recognition | $0 |

**Global—Misappropriation of trade secrets**
Identical to damages for Duckworth's misappropria-
   tion (verdict form said $50,000 caused by each)      $50,000

While nothing in the record on appeal provides an explanation, the district court apparently reduced the damages against Duckworth for his breach of contract ($275,000) or his breach of fiduciary duty ($275,000) by entering judgment against him for $325,000 ($275,000 plus $50,000 [for trade secret misappropriation]). It also entered judgment against Global for $275,000 ($225,000 plus $50,000). Defendants then filed various posttrial motions, including a remittitur that stated the evidence could support an award of only $50,000, with $25,000 assessed against each defendant. The district court denied the motions.

Wolfe Electric filed a posttrial motion under K.S.A. 60-901 and K.S.A. 60-3321(a) seeking to permanently enjoin Global from involvement in conveyor pizza ovens. In May 2007, the court imposed a 4-year injunction against Global, retroactive to the date of the filing of the lawsuit: October 21, 2005.

The court also awarded $140,122.06 in attorney fees under KUTSA, which was a reduction to 65% of the total fees incurred to make it proportionate to the claims for misappropriation of trade secrets. Fees were assessed against defendants jointly and severally based on their willful and malicious violation of KUTSA.

Duckworth and Global appealed the jury verdict, damage award, and injunction but not the rejection of Duckworth's breach of contract claim against Wolfe Electric. We transferred this case from the Court of Appeals pursuant to K.S.A. 20-3018(c).

More facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The trial court erred in important jury instructions.*

Defendants allege several problems with Jury Instruction 3, commonly known as the parties' contentions instruction (see PIK Civ. 4th 106.01). They both allege Instruction 3 improperly allowed them to be held liable under KUTSA for misappropriating something less than a trade secret. Duckworth next alleges that Instruc-

tion 3 was also partly based upon an erroneous interpretation of his employment contract that, contrary to the contract's plain language, improperly allowed him to be held liable for its breach for simply competing against Wolfe Electric. Finally, Global alleges that Instruction 3 was further contrary to the plain language of Duckworth's employment contract, which then improperly allowed Global to be held liable for tortious interference for simply inducing Duckworth to solicit business from Wolfe Electric's prospective customers or from its vendors or suppliers.

Defendants further allege error in certain provisions of Instructions 5 and 8 because they were not supported by the evidence.

*Standard of Review*

Defendants objected at the trial court to giving these instructions to the jury. As a result, our standard of review for all four arguments regarding Instructions 3, 5, and 8 is the same:

"It is the duty of the trial court to properly instruct the jury upon a party's theory of the case. Error regarding jury instructions will not demand reversal unless it results in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. *If the instructions are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal.*" (Emphasis added.) *In re Care & Treatment of Foster*, 280 Kan. 845, Syl. ¶ 10, 127 P.3d 277 (2006).

See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 256, 225 P.3d 707 (2010). But see *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011) (in context not involving allegedly erroneous instructions, error is harmless when did not affect party's substantial rights, *i.e.*, will not or did not affect trial's outcome. If error implicates a right guaranteed by United States Constitution, court must be persuaded beyond reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable *possibility* error contributed to verdict. If constitutional right not implicated, court must be persuaded there is no reasonable *probability* that error will or did affect outcome of trial.)

Each claim of instructional error will be analyzed below.

*Discussion*

a. *The allegation that Instruction 3 improperly allowed both defendants to be held liable under KUTSA for misappropriating something less than a trade secret*

Defendants point out that Instruction 3 included the term "confidential information" in the provision alleging violation of KUTSA. They contend KUTSA does not mention confidential information but rather is limited to protecting misappropriation of an actual "trade secret." As a result, defendants argue this inclusion erroneously informed the jury that it could find them liable for Duckworth's sharing even nontrade secret information with Global.

Wolfe Electric denies any error, responding that Instruction 3 is just the "combined proposed contention instructions of both parties." It also argues that the jury was properly instructed on the elements of KUTSA in Instructions 9 and 10. Accordingly, it appears to conclude these instructions, taken together, were substantially correct and the jury could not reasonably have been misled by them.

Instruction 3 is seven pages long. The following provisions contain Wolfe Electric's allegations regarding defendants' violations of KUTSA:

"The Plaintiff claims that is [*sic*] sustained damage due to the following alleged violations of the Kansas Uniform Trade Secrets Act by the Defendants, Terry Duckworth and Global Cooking Systems, LLC:

"1) using or attempting to use Wolfe Electric's trade secrets *and confidential information* to develop, manufacture and sell conveyor pizza ovens;

"2) conveying Plaintiff Wolfe Electric's trade secrets *and confidential information* to JayCat, Inc. d/b/a Carlson Products to develop, manufacture and sell conveyor pizza ovens;

"3) using or attempting to use Wolfe Electric's trade secrets *and confidential information* to solicit or attempt to solicit conveyor oven pizza sales to Wolfe Electric former, current or prospective customers;

"4) using or attempting to use Wolfe Electric's trade secrets *and confidential information* to solicit or attempt to solicit from Wolfe's vendors and suppliers." (Emphasis added.)

We begin our analysis by agreeing with defendants that KUTSA only prohibits misappropriation of "trade secrets." It does not mention "confidential information." Accordingly, remedies concerning

nontrade secrets, *e.g.*, mere confidential information, cannot be obtained through a KUTSA cause of action. See, *e.g.*, *First Advantage Background Services v. Private Eyes*, 569 F. Supp. 2d 929, 942 (N.D. Cal. 2008) ("By its own terms, however, CUTSA only provides remedies for misappropriation of *trade secrets*, not of any confidential information, and defines that term specifically." [Emphasis added.]); *Electro-Craft Corp. v. Controlled Motion*, 332 N.W.2d 890, 897 (Minn. 1983) (stating that under the UTSA, "[w]ithout a proven trade secret there can be no action for misappropriation, even if defendants' actions were wrongful").

As further support, we look to KUTSA's plain language. See *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, Syl. ¶ 1, 218 P.3d 400 (2009) (statutory interpretation is a question of law; appellate court not bound by district court interpretation). We observe K.S.A. 60-3328 provides the Act may be cited as the "uniform trade secrets act." Furthermore, K.S.A. 60-3320, the definition provision of KUTSA, does not define confidential information but does define "trade secret":

"(4) *'Trade secret'* means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Emphasis added.) K.S.A. 60-3320(4).

Additionally, K.S.A. 60-3320(2) defines "misappropriation" entirely in terms of trade secrets:

"(2) . . . (i) acquisition of a *trade secret* of another by a person who knows or has reason to know that the *trade secret* was acquired by improper means; or

(ii) disclosure or use of a *trade secret* of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the *trade secret*; or

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the *trade secret* was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a *trade secret* and that knowledge of it had been acquired by accident or mistake." (Emphasis added.) K.S.A. 60-3320(2).

Moreover, only such defined "misappropriation," *i.e.*, limited to trade secrets, can serve as the basis for recovery under KUTSA for compensatory and exemplary damages, injunctive relief, and attorney fees. See K.S.A. 60-3321 (injunctive relief); K.S.A. 60-3322 (damages); K.S.A. 60-3323 (attorney fees).

That said, the definitions jury instruction upon which Wolfe Electric partially relies to claim the instructions when considered together were substantially correct, Instruction 9, correctly quotes the KUTSA definition of "trade secret." It also provides a separate definition for "confidential business or classified information":

"The terms 'confidential business information' and 'classified information' mean the commercial and financial information of the Plaintiff

"1) that is secret and

"2) the disclosure of which could harm the business of Plaintiff Wolfe Electric."

The other instruction upon which Wolfe Electric partially relies to claim the instructions were substantially correct, Instruction 10, lists the elements of its claim needed to prove liability under KUTSA against the defendants. As for Duckworth:

"Plaintiff may recover damages from defendant *Duckworth* for misappropriation of *trade secrets* of [*sic*] plaintiff proves:

"1. The matters that the plaintiff claims are *trade secrets* are in fact *trade secrets*;

"2. Defendant Duckworth acquired those *trade secrets* at a time when he knew or had reason to know that his knowledge of the *trade secrets* was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use;

"3. Defendant Duckworth used or disclosed the *trade secrets* without the authorization of plaintiff; and

"4. Plaintiff suffered damages as a direct and proximate result of defendant Duckworth's use or disclosure of the *trade secrets*." (Emphasis added.)

As for the KUTSA claim against defendant Global, Instruction 10 states something slightly different:

"Plaintiff may recover damages from defendant *Global Cooking* for misappropriation of *trade secrets* if plaintiff proves:

"1. The matters that the plaintiff claims are *trade secrets* are in fact *trade secrets*;

"2. Global Cooking acquired those secrets by improper means;

"3. Global Cooking used the *trade secrets* without authorization of plaintiff; and

"4. Plaintiff suffered damage as a direct and proximate result of Global Cooking's use of the *trade secrets*." (Emphasis added.)

Clearly, Instruction 10—the KUTSA elements instruction—did not mention, much less list the elements of, misappropriation of confidential business information or classified information. Additionally, Instruction 9 provides definitions of these terms different from the definitions of "trade secrets." And admittedly Instruction 3 is an expression of Wolfe Electric's claims and defendants' defenses, rather than a statement of the elements to be proven in each claim.

Just as clearly, however, the trial court should not have allowed Wolfe Electric repeatedly to include the term "confidential information" in its Instruction 3 "claim[s] that is [*sic*] sustained damage due to . . . . alleged violations of the Kansas Uniform Trade Secrets Act by the Defendants." KUTSA allows recovery only for misappropriation of trade secrets, not confidential information. See *First Advantage Background Services*, 569 F. Supp. 2d at 942. This instruction improperly informed the jury that under KUTSA Wolfe Electric could, and did, allege defendants misappropriated something besides a trade secret.

Equally clear is the repetition of this error on the jury verdict form. On the page captioned "Wolfe Electric's Claim Against the Defendants for Misappropriation of Trade Secrets," the jury is separately asked, for each of the four separate alleged violations of KUTSA, if it finds that defendants "misappropriated trade secrets" by improper use or attempts to use "Wolfe Electric's trade secrets *and confidential information*." (Emphasis added.) The jury answered "yes" four times. Whether this repeated error requires reversal depends upon our analysis of other alleged instructional error. See *In re Foster*, 280 Kan. 845, Syl. ¶ 10 (instructions approved on appeal if substantially correct and jury could not reasonably be

misled by them); see *Unruh v. Purina Mills*, 289 Kan. 1185, 1197-98, 221 P.3d 1130 (2009) (same standards apply to jury verdict forms).

> b. *Duckworth's allegation that Instruction 3 was also partly based upon an erroneous interpretation of his employment contract that, contrary to the contract's plain language, improperly allowed him to be held liable for its breach for simply competing against Wolfe Electric*

Duckworth additionally argues that the trial court erred in giving part of Instruction 3, not only over his objection, but also after denying his motion for judgment as a matter of law, because one of Wolfe Electric's nine claims contained in the instruction misinterpreted his contract. More particularly, he argues that "[t]he claim Duckworth violated the employment contract just by competing with Wolfe, Inc., was contrary to its plain language."

Wolfe Electric responds that the primary rule of interpreting written contracts is to ascertain the intent of the parties, citing *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 46 P.3d 1120 (2002). It further points out the trial court ruled that the jury was going to have the contract for its review and would "be able to figure out what the contract means." It seems to suggest the jury properly interpreted the contract to mean that all competition was prohibited: "There is substantial competent evidence in the record to support the jury's finding that Duckworth materially breached the employment agreement by . . . competing with Wolfe Electric in the manner in which he did."

Duckworth appears to challenge the first paragraph of Instruction 3, which identifies an alleged act in breach of his contract:

"The Plaintiff, Wolfe Electric, Inc., claims that it sustained damages due to the following alleged breach or breaches of the Employment Agreement / Contract by the Defendant, Terry Duckworth:

"1) *forming Global Cooking Systems, LLC* within the period prohibited by the restrictive covenants in the Employment Agreement *for the purpose of competing with Wolfe Electric*." (Emphasis added.)

As mentioned, Duckworth's employment contract's restrictive covenant is found in paragraph 7. The restrictions relevant to this argument are quite narrow:

"(c) Furthermore, and upon the same consideration as before, Employee expressly stipulates and agrees that *he shall not solicit, seek or obtain from any active or inactive customers of Employer,* any business or trade on his own behalf or on the behalf of any future employer, *which said business or trade activity would be competitive of Employer for a period of one (1) year* commencing from the date of Employee's termination." (Emphasis added.)

We conclude the language in Instruction 3's first paragraph is general enough to authorize the jury to find Duckworth breached his contract for the simple act of forming Global to compete against Wolfe Electric. This specific action, however, clearly is not prohibited by the contract's narrow restrictive covenant. See *Osterhaus v. Toth,* 291 Kan. 759, 768, 249 P.3d 888 (2011) (legal effect of a written instrument is a question of law; it may be construed and its legal effect determined by the appellate court). Consequently, as a matter of law, Duckworth could not be in breach for performing this action. Accordingly, whether substantial competent evidence supports the jury finding of Duckworth's material breach of the contract by forming Global to compete against Wolfe Electric is irrelevant.

For these reasons, we conclude the trial court should not have allowed Wolfe Electric to include this specific allegation in its Instruction 3 claims "that it sustained damages due to . . . alleged breach or breaches of the Employment Agreement/Contract by the Defendant, Terry Duckworth." And unlike with the KUTSA instructional error previously discussed, the elements instruction (Number 4) does not ameliorate any effect of the error. It instructs the jury that an essential element of the breach of contract cause of action includes "defendant's breach of the contract."

But like with the KUTSA instructional error, this contract instructional error is also repeated on the jury verdict form. On the page captioned "Wolfe Electric's Claim Against Terry Duckworth for Breach of Contract," the jury is asked if it finds that Duckworth breached his employment agreement by (1) simply "forming defendant Global . . . within the period prohibited by the restrictive covenants in the Employee Agreement for the purpose of competing with plaintiff Wolfe Electric." The jury answered this ques-

tion "yes." Whether this repeated error requires reversal depends upon our analysis of other alleged instructional errors.

> c. *Global's allegation that Instruction 3 was further contrary to the plain language of Duckworth's employment contract, which then improperly allowed Global to be held liable for tortious interference with the contract for simply inducing Duckworth to solicit business from Wolfe Electric's prospective customers or from its vendors or suppliers*

Global also argues that the trial court erred in giving another part of Instruction 3 because it improperly allowed Global to be held liable for tortious interference with Duckworth's employment contract for simply inducing him to solicit business from Wolfe Electric's prospective customers or from its vendors or suppliers. As support, Global points out that the restrictive covenant contained in paragraph 7(c) of Duckworth's contract quoted verbatim earlier was limited to "any active or inactive customers of" Wolfe Electric for 1 year after termination. It also points out that paragraph 7(c) makes no reference whatsoever to "vendors or suppliers."

To the extent Wolfe Electric can be said to respond, it argues: "There is substantial competent evidence to support the jury's finding that Duckworth materially breached the employment agreement by . . . soliciting Wolfe Electric's current, former and *prospective customers and suppliers.*" (Emphasis added.)

We observe that the relevant provision in Instruction 3 concerning the tortious interference claim against Global states:

"The Plaintiff, Wolfe Electric, claims that it sustained damages due to the following alleged acts of tortious interference with existing contractual relations by the Defendant, Global Cooking Systems, LLC:

"1) inducing and encouraging Defendant Terry Duckworth to breach his Employment Agreement by soliciting or attempting *to solicit conveyor pizza oven sales from Wolfe Electric's* former, current or *prospective customers;* [and]

"2) inducing and encouraging Defendant Terry Duckworth to breach his Employment Agreement by soliciting or attempting *to solicit business from Wolfe Electric's vendors and suppliers.*" (Emphasis added.)

We conclude the language in Instruction 3 authorizes the jury to find Global tortiously interfered with Duckworth's contract for

simply inducing him to solicit business from Wolfe Electric's prospective customers or from its vendors or suppliers. These specific actions by Duckworth, however, clearly are not prohibited by the contract's narrow restrictive covenant. See *Osterhaus*, 291 Kan. at 768 (legal effect of a written instrument is a question of law; it may be construed and its legal effect determined by the appellate court). As a result, whether substantial competent evidence supports the jury finding of Duckworth's material breach of the contract by soliciting Wolfe Electric's prospective customers and its suppliers is irrelevant. Because Duckworth was not in breach for performing these actions, as a matter of law Global could not have interfered with the contract by inducing him to perform them. See *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 423, 77 P.3d 130 (2003) (elements essential to recovery for tortious interference with a contract include the wrongdoer's intentional procurement of its breach).

For these reasons, we conclude the trial court should not have allowed Wolfe Electric to include the allegations regarding "prospective customers" and "vendors and suppliers" in its "claims that it sustained damages due to the . . . alleged acts of tortious interference with existing contractual relations by the Defendant, Global."

Like with the KUTSA instructional error previously discussed, another instruction, Instruction 12, correctly sets forth the elements needed to prove liability of Global on the claim of tortious interference. But, unlike the KUTSA instructional error—and like the Duckworth contract instructional error discussed above—this elements instruction contains no language ameliorating the effect of the error on the tortious interference claim against Global.

Unlike the KUTSA and Duckworth contract instructional errors discussed above, the first error in Instruction 3 regarding tortious interference was not repeated in the jury verdict form. "Prospective" customers were deleted on the page captioned "Wolfe Electric's claim against Global for Tortious Interference with existing contractual relations."

"Do you find that Defendant Global Cooking Systems tortiously interfered with the Employment Agreement between Plaintiff Wolfe Electric and Defendant Terry Duckworth—

"1) By inducing and encouraging Defendant Terry Duckworth to breach his Employment Agreement by soliciting or attempting to solicit conveyor pizza oven sales from Plaintiff Wolfe Electric's *former or current customers*?" (Emphasis added.)

Nevertheless, inconsistency exists between Instruction 3 and the jury verdict form. More important, like the KUTSA and Duckworth contract instructional errors, the other error in Instruction 3—the wrongful inclusion of vendors and suppliers—is also repeated on the jury verdict form. The jury is asked if it finds that Global tortiously interfered: "2) By inducing and encouraging Defendant Duckworth to breach his Employment Agreement by soliciting or attempting to solicit business from Plaintiff Wolfe Electric's *vendors and suppliers*." (Emphasis added.) The jury answered this question "yes."

Like the earlier errors, whether these require reversal depends upon our analysis of other alleged instructional errors.

### d. *Defendants' allegation that parts of Instructions 5 and 8 were not supported by the evidence*

Both defendants argue the trial court committed additional instruction error when it instructed the jury on two categories of damages without evidence to justify them. They contend these parts of the instructions therefore encourage the jury to speculate as to damages, citing *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 50, 519 P.2d 667 (1974) ("The jury should not be allowed to merely speculate in arriving at damage[s] . . . . One who claims damages on account of a breach of contract must not only show the injury sustained, but must also show with reasonable certainty the amount of damage suffered as a result of the breach.").

Defendants specifically argue a lack of evidence to support instructing on the damage claims for lost opportunity for sales and loss of good will. They point out that Instruction 5 instructed the jury to award damages for Duckworth's breach of his employment contract by considering "any of the following elements of damage that you find were the result of the breach": "(2) loss of opportunity for sales of conveyor pizza ovens; . . . and (4) loss of good will."

Instruction 8 authorized the jury to award damages for Duckworth's breach of his fiduciary duty. It is identical to Instruction 5 regarding the categories for which damages were sought, *e.g.*, loss of opportunity for sales of conveyor pizza ovens and loss of good will. Damage categories were not so delineated in Instruction 13 regarding the claim for Global's tortious interference. More important, we independently observe Instruction 13 incorrectly states that for this cause of action damages should be awarded sufficient to fairly compensate plaintiff for damages suffered "as a direct result of the *breach of the contract by Global*." (Emphasis added.) Obviously, according to Instruction 12's accurate recitation of the elements, Global cannot be found liable for tortious interference for breaching a contract to which it is not a party. See *Burcham*, 276 Kan. at 423, (elements essential to recovery for tortious interference with a contract include the wrongdoer's intentional *procurement* of its breach). Instructions 12 and 13 are in conflict.

On the verdict form, the jury awarded $50,000 for loss of good will and $125,000 for loss of opportunity for sales of pizza ovens under both Wolfe Electric's claim for Duckworth's breach of his contract and breach of his fiduciary duty. Although the reasons are not contained in the record, this duplication may have been why the trial court reduced the damages against Duckworth. While the jury had not been instructed regarding these specific categories of damages in Instruction 13, the Global interference claim, the jury nevertheless also awarded $125,000 in loss of opportunity for sales for the tortious interference. It left blank the line on the verdict form for loss of good will.

Regarding Wolfe Electric's evidence of damages for the loss of good will, it points to the testimony of Ron Wolfe. Its record citation, however, does not mention the phrase "good will." Moreover, the citation contains no financial figures, much less opinions of values—whether based upon financial figures or otherwise. Wolfe Electric does not otherwise provide citations where this evidence would be found in the transcripts and other records of a 3-week jury trial. See Supreme Court Rule 6.03(c) (2010 Kan. Ct. R. Annot. 43) (citing Rule 6.02[d] [2010 Kan. Ct. R. Annot. 39]) ("Any material statement made without such a reference ['keyed to the

record on appeal by volume and page number so as to make verification reasonably convenient'] may be presumed to be without support in the record."); *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 623, 244 P.3d 642 (2010).

Wolfe Electric does not specifically address damages for loss of opportunity for sales. Instead, it denies defendants' allegation that no damages had been shown by generally responding: "To give the most glaring example, there was direct testimony from the defendants themselves as to the ovens they had sold." It asserts: "The sales thus achieved of this infringing oven are ill-gotten and damaging to Wolfe Electric in the amounts set forth on the verdict form." It then argues that the jury damage awards "are supported by the damages testimony of Ron and Gary Wolfe (ROA) [record on appeal] and by the defendants' own evidence of their sales to date." Contrary to Supreme Court Rule 6.03(c), no citation to the record is provided there for the Wolfes' testimony.

Because Wolfe Electric does not refer us to any part of the record on appeal, we assume it may be referring to statements in its brief's "Statement of Additional Facts"—again, without citation to the record even there—that "[b]y October 25, 2006, defendants had sold at least 9 ovens and shipped an additional test oven to Wings-N-Things in Dallas." Wolfe Electric immediately argues, again in its facts section, that "[b]y these actions [and others, for which no specific loss of sales is provided], defendants deprived Wolfe Electric of the opportunity to make these sales . . . ." It later refers, with appropriate citation to the record, to Ron Wolfe's testimony that Wolfe Electric's profit in each oven sold was about $5,000. Wolfe Electric concludes, again in its facts section, that "[f]rom this information, the jury did not have to speculate about damages. They knew the profit in each oven, they knew the sales to date Global had achieved."

In our effort to be thorough, we observe that in the facts section of Wolfe Electric's brief, it also refers to being "damaged by the defendants' wrongful acts as follows:

"1. Global sold to Wings-N-Things, which company was one of Wolfe Electric's Dealers, Brad Waller, [and Waller] was engaged in negotiations to execute a contract for the XLT [Wolfe Electric's oven], sending them a test oven in 2005. Waller

was only able to sell them one XLT, however, they switched over thereafter to Global's oven."

According to the transcript citations Wolfe Electric provides, Waller was a distributor/seller of Wolfe Electric's ovens in several states. Consequently, Wolfe Electric may intend for this factual recitation to be a reference to its lost opportunity for oven sales to Wings-N-Things.

In analyzing the good will damages issue, we agree with defendants. We have searched the record cited by Wolfe Electric, including Ron Wolfe's testimony regarding his company's greatly increased revenues every year. After construing the evidence in the light most favorable to Wolfe Electric, as we must, there clearly is insufficient evidence to support the giving of the part of the instructions requesting damages for loss of good will. As we stated in *State ex rel. Stephan v. Wolfenbarger & McCulley, P.A.*, 236 Kan. 183, 188, 690 P.2d 380 (1984), " '[i]n order for the evidence to be sufficient to warrant recovery of damages there must be some reasonable basis for computation which will enable the jury to arrive at an approximate estimate' " of the damages. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, Syl. ¶ 3, 228 P.3d 1048 (2010) ("An appellate court reviews the trial court's determination to give . . . an instruction on a party's theory by examining the record to determine if there is evidence supporting the theory which, if accepted as true and viewed in the light most favorable to the requesting party, is sufficient for reasonable minds to reach different conclusions based on the evidence.").

Whether there is sufficient evidence to support the giving of the part of the instructions for loss of opportunity for sales of ovens is a little less clear. We start with Ron Wolfe's testimony that he could not put an actual figure on lost sales. We acknowledge Wolfe Electric's cited evidence showing that its ovens were each typically sold at prices allowing for $5,000 profit per oven. We also acknowledge defendants' concession, with citation to the record, that Duckworth testified Global sold 10 ovens. Per Wolfe Electric's apparent multiplication performed in its brief—its profit on each oven times the sales Global had achieved—this theoretically would constitute

$50,000 in lost profits of Wolfe Electric. The jury unquestionably awarded $50,000 for lost profits in each of three different causes of action: breach of contract, breach of fiduciary duty, and tortious interference.

Indeed, using this same equation, defendants conceded in their posttrial motions and appellate brief that "[t]herefore, some evidence existed as to loss of profits ($5,000 $\times$ 10 = $50,000)." At the remittitur hearing, defendants also conceded the jury could have calculated its $50,000 award for loss of trade secrets and confidential business information based upon the same testimony supporting the award for lost profits. However, like defendants, we conclude it will not also provide the basis for loss of opportunity for sales. This is particularly true when there is no record evidence cited to this court from a 3-week jury trial that Wolfe Electric had actually lost sales with any of the entities it specifically mentioned. For example, its uncited Domino's Pizza example is also argued as merely defendants' "attempt to solicit business." While its "Statement of Additional Facts" alleges that defendants sold an oven to Perfect Pizza, LLC, Wolfe Electric provides no cite to the record on appeal to support this allegation. We presume there is no such evidence. See Supreme Court Rule 6.03(c).

While arguably Waller's testimony might suggest loss of opportunity of sales with Wings-N-Things, there is no evidence providing the number of the Global ovens sold to this entity from which a lost opportunity for Wolfe Electric might be imputed and damages might be calculated. Waller's vague statement is insufficient: "They switched over thereafter to Global's oven." Admittedly, Wolfe Electric does allege in its brief's "Statement of Additional Facts" that defendants sold their first oven to Wings-N-Things. However, it again fails to cite to the record to support this allegation. We again presume there is no such evidence. See Supreme Court Rule 6.03(c).

We conclude that even when construing the evidence in the light most favorable to Wolfe Electric, as we must, there is insufficient evidence to support the giving of the part of the instructions requesting damages for loss of opportunity for sales. In short, there is no reasonable evidentiary basis for computation which will en-

able the jury to arrive at an approximate estimate of damages. See *Puckett,* 290 Kan. 406, Syl. ¶ 3; *Wolfenbarger,* 236 Kan. at 188.

As a result, the court erred in giving these parts of Instructions 5 and 8 to the jury. As mentioned, the court also erred in giving that part of Instruction 13 which informed the jury it could award damages for Global's tortious interference with Duckworth's contract if Global breached that contract. In short, of the jury instructions defining the four legal theories for defendants' liability, only the instruction concerning Duckworth's breach of fiduciary duty was without error.

We now turn to the question of whether these multiple jury instruction errors require reversal. As our standard, we have held that instructions will be approved on appeal if they are substantially correct and the jury could not reasonably be misled by them. *In re Care & Treatment of Foster,* 280 Kan. 845, 864, 127 P.3d 277 (2006).

Our harmlessness analysis is complicated by several factors. They include: (1) five total causes of action, with three against Duckworth and two against Global; (2) although later modified by the trial court, identical jury damage awards of $275,000 against Duckworth for his breach of contract and his breach of fiduciary duty, including damages of $50,000 for lost profits and $50,000 for loss of trade secrets and confidential information, and (unsupported) damages of $125,000 for lost opportunity for sales and (unsupported) damages of $50,000 for loss of good will; (3) for all but one of the categories of jury damage awards against Duckworth (for his breach of contract and breach of fiduciary duty), awards identical to those against Global (for tortious interference with existing contractual relations): damages of $50,000 for lost profits, $50,000 for loss of trade secrets and confidential information, and (unsupported) damages of $125,000 in lost opportunity for sales; (4) identical jury awards of $50,000 each in unspecified damages against Duckworth and Global for their misappropriation of trade secrets under KUTSA; (5) lack of information regarding the numerous categories of damage awards to identify the acts upon which each award is based, *e.g.,* suggesting that the same act could have caused the same damages and created duplicative awards; and (6) lack of

information on why the trial court reduced Wolfe Electric's damage award against Duckworth by $275,000—whether on grounds of duplicative award, lack of liability as a matter of law, or otherwise.

For example, we cannot determine how much, if any, in damages the jury improperly allocated for purely "confidential information" in its awards of $50,000 under KUTSA for Duckworth's misappropriation of trade secrets or of $50,000 for Global's misappropriation of trade secrets. The jury verdict form for KUTSA simply assesses $50,000 against each as the "amount of damages sustained by Wolfe Electric."

Similarly, we cannot determine how much, if any, in damages the jury improperly allocated for Duckworth's simply "forming Global for the purpose of competing with Wolfe Electric" in its award of $275,000 for his breach of contract. It was only one of nine specific acts of breach alleged.

Nor can we determine the "categories" of damages for breach of contract in which any improper allocation for this mere competition may have been made by the jury. For example, if the improper allocation were made for lost opportunity for sales or loss of good will, it would be of no consequence because we already have determined that these particular awards had no evidentiary basis and were therefore invalid. But if the improper allocation were made for lost profits, it could be of some consequence because, as defendants concede, that award was arguably supported by some evidence: ($5,000 Wolfe Electric profit per oven × 10 Global ovens sold = $50,000 lost profits).

Nor can we determine whether any such improper "mere competition" allocation of the damage award for breach of contract was also somehow present in the jury's verdict against Global for its tortious interference. Although no claim based upon mere competition was alleged for this tort, the damage awards there were assessed identical in category and amount to those for breach of contract: lost profits of $50,000 and loss of trade secrets and confidential information of $50,000. And if an improper jury allocation for "mere competition" had been made in the $50,000 in damages awarded for loss of trade secrets and confidential information for

Duckworth's breach of contract, we cannot determine whether this allocation had also been improperly contained in each of the (unspecified) identical $50,000 damages awarded against both Duckworth and Global for this loss of identical information due to their misappropriation under KUTSA. This uncertainty is present even though no claim based upon mere competition was alleged under KUTSA.

For many of these same reasons, we cannot determine how much, if any, in damages the jury improperly allocated in its $225,000 award for Global tortiously interfering with Duckworth's contract because Global simply induced him to solicit business from Wolfe Electric's prospective customers or from its vendors or suppliers. For example, these particular acts were contained in two of the three categories of tortiously interfering conduct alleged by Wolfe Electric. Nor can we determine how much, if any, of the $225,000 award the jury improperly allocated, per Instruction 13, as a result of Global's alleged breach of contract—which is not an element of this tort. Nor can we determine the specific categories of damages for tortious interference in which any improper allocation may have been made. Again, such allocation would be important because if for lost opportunity for sales or loss of good will it would be of no consequence, while allocation for lost profits would be.

Because there is no reasonable basis for us to excise the multiple erroneous parts of the jury instructions and, correspondingly, to accurately modify the accompanying jury awards of damages, the case must be remanded for a new trial. We consider some of the additional issues only to provide guidance to the district court in the event the same issues resurface. See *State v. Simmons*, 292 Kan. 406, 423, 254 P.3d 97 (2011).

Issue 2: *Certain tort claims are barred by KUTSA.*

Defendants make an argument somewhat related to the error contained in Instruction 3 that improperly allowed liability under KUTSA for misappropriating something besides a trade secret, *i.e.*, mere confidential information. More specifically, they argue that those portions of Wolfe Electric's tort claims requesting recovery

for loss of trade secrets—Duckworth's breach of fiduciary duty and Global's tortious interference—were preempted by KUTSA as a matter of law. Citing K.S.A. 60-3326 and caselaw, they therefore contend their dispositive motions based upon this ground should have been granted by the trial court.

Wolfe Electric's brief concedes that KUTSA "certainly does displace traditional tort remedies with respect to trade secrets" and essentially abandons any of its claims for recovery for loss of trade secrets through these two tort causes of action. It somewhat gratuitously adds, however, that "confidential and proprietary information" that does not rise to the level of being a trade secret can still be, and should be, protected through these tort causes of action. Wolfe Electric provides no legal authorities to support any of its arguments.

Despite Wolfe Electric's concession and resultant abandonment, we nevertheless must address the accuracy of the purported legal basis of its concession. See *Urban Renewal Agency v. Reed*, 211 Kan. 705, 711-12, 508 P.2d 1227 (1973) (stating that generally questions of law must be determined by the court, unlimited by agreement of the litigants; their stipulations as to what the law is are ineffective to bind the court); *Herl v. State Bank of Parsons*, 195 Kan. 35, 48, 403 P.2d 110 (1965) (court is not bound by an admission of law made by one party in its brief) (Schroeder, J., dissenting). We independently observe one could argue that resolution of this issue is of no practical consequence regarding Duckworth's breach of fiduciary duty because Wolfe Electric was awarded an identical damage award—$275,000—for breach of contract for the same categories of damages. They may be entirely duplicative. But because the jury was not asked to assign specific acts for the categories, and because we have not been provided the reasons why the trial court reduced the total damages against Duckworth by $275,000, we proceed with our analysis.

Whether Wolfe Electric's trade secret claims based upon tort were preempted by KUTSA requires statutory interpretation, a question of law subject to de novo review. See *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, Syl. ¶ 1, 218 P.3d 400 (2009).

This question is answered in the affirmative by K.S.A. 60-3326. It states in relevant part:

"(a) Except as provided in subsection (b), this act *displaces conflicting tort*, restitutionary and other *law of this state providing civil remedies for misappropriation of a trade secret*.

"(b) This act *does not affect*:
(1) Contractual remedies, whether or not based upon misappropriation of a trade secret;
(2) other civil remedies that are not based upon misappropriation of a trade secret; or
(3) criminal remedies, whether or not based upon misappropriation of a trade secret." (Emphasis added.)

According to one commentator, "[t]he drafters [of Section 7 of the Uniform Trade Secrets Act, identical to K.S.A. 60-3326] explicitly abrogate other civil remedies based on misappropriation of a defined trade secret and, among the courts, there seems to be little dispute that the UTSA did, in fact, intend to abrogate other civil remedies when a claim involves misappropriation of a trade secret." Comment, *I Have a Secret?: Applying the Uniform Trade Secrets Act to Confidential Information That Does Not Rise to the Level of Trade Secret Status*, 12 Marq. Intell. Prop. L. Rev. 359, 367 (Summer 2008); see, *e.g., BlueEarth Biofuels v. Hawaiian Elec. Co.*, 123 Hawaii 314, 318, 235 P.3d 310 (2010) (stating that "[c]ourts that have considered the UTSA's preemption provision have 'uniformly interpreted [it] to preempt previously existing misappropriation of trade secret actions, whether statutory or common law' [Citations omitted.]").

That said, we now provide guidance on remand. Defendants frame their appellate argument as trial court error for not granting their motions for judgment as a matter of law, not for giving erroneous jury instructions. Nevertheless, Instruction 3 improperly informed the jury that Wolfe Electric could, and did, allege Duckworth breached his fiduciary duty and caused damages by:

"1) using or attempting to use Wolfe Electric's *trade secrets* and confidential information to develop, manufacture and sell conveyor pizza ovens;

"2) using or attempting to use Wolfe Electric's *trade secrets* and confidential information to solicit or attempt to solicit conveyor pizza oven sales to Wolfe Electric's active or inactive customers;

"3) using or attempting to use Wolfe Electric's *trade secrets* and confidential information to solicit or attempt to solicit business from Wolfe Electric's vendors and suppliers; and

"4) usurping corporate opportunities from Wolfe Electric." (Emphasis added.)

This error is repeated verbatim on the jury verdict form, with the jury expressly awarding $50,000 for *"loss of trade secrets* and confidential business information" for breach of fiduciary duty. (Emphasis added.)

Instruction 3 also improperly informed the jury that Wolfe Electric could, and did, allege that Global tortiously interfered with Duckworth's contract by, among other things, "3) inducing and encouraging Defendant Duckworth to breach his Employment Agreement by divulging Wolfe Electric's *trade secrets* and confidential information." (Emphasis added.) Like the error regarding breach of fiduciary duty, this error is also repeated verbatim on the jury verdict form. In turn, the jury expressly awarded $50,000 for *"loss of trade secrets* and confidential business information" for tortious interference. (Emphasis added.)

In summary, we have concluded the trial court was twice overly inclusive in its instructions on the claims for recovery for trade secrets and for mere confidential information. We held in Issue 1 the trial court erroneously allowed Wolfe Electric to include a request for damages under KUTSA for *non*trade secrets, *i.e.,* "confidential information." This is error because KUTSA limits recovery for trade secrets only. See, *e.g., First Advantage Background Services v. Private Eyes,* 569 F. Supp. 2d 929, 942 (N.D. Cal. 2008). Now we conclude in Issue 2 that the trial court also erroneously—and perhaps ironically—allowed Wolfe Electric to include a request for damages for trade secrets under the two tort causes of action. This is error because tort causes of action cannot include a claim to recover for trade secrets; KUTSA is the exclusive remedy. See K.S.A. 60-3326.

As mentioned, defendants did not frame this issue as a jury instruction error. Nevertheless, our conclusion on KUTSA preemption of the tort claims based upon trade secrets further supports our overall determination that the instructional errors are reversible. For example, on Wolfe Electric's claim of Global's tortious

interference, we cannot determine how much, if any, of the jury's general damage award of $50,000 for loss of trade secrets and confidential business information was improperly allocated for trade secrets.

As for Wolfe Electric's assertion that KUTSA does not displace other tort causes of action for recovery of damages for nontrade secrets, we do not address it for several reasons. First, it has no apparent bearing on defendants' narrow argument on appeal. Second, even if so, Wolfe Electric has cited no authorities allegedly supporting its position; defendants have never even acknowledged the issue, much less addressed it in their reply brief. Third, Wolfe Electric has not shown that the issue was raised below, which would preclude its being properly raised to this court. See *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, Syl. ¶ 12, 135 P.3d 1127 (2006) (as general rule, issues not raised before trial court cannot be raised for first time on appeal). We have stated this precept exists because appellate courts should be reluctant to interfere with the course of litigation determined in the trial courts, resulting in deference to them. *Johnson v. Kansas Neurological Institute*, 240 Kan. 123, 126, 727 P.2d 912 (1986), *overruled in part on other grounds by Denton v. Sunflower Electric Co-Op.*, 242 Kan. 430, 748 P.2d 420 (1988).

Most important, the issue may be raised on remand. See *State v. Cady*, 254 Kan. 393, 401, 867 P.2d 270 (1994) (although an issue not raised below is precluded on appeal, the issue may be raised on remand). At the trial court, the parties should be given the opportunity to fully brief and argue the issue, instead of this court attempting to decide it without the benefit of their briefs and arguments and the trial court's analysis.

Issue 3: *The trial court erred in letting the jury interpret the contract.*

Duckworth next argues the trial court should not have allowed the jury to interpret his employment contract. More particularly, he appears to complain the court erred in denying his dispositive motions to reject Wolfe Electric's claims that mere competition by Duckworth violated the restrictive covenants of his employment

contract and then in allowing the jury to determine whether mere competition breached the contract. He cites *Reimer v. The Waldinger Corp.*, 265 Kan. 212, 214, 959 P.2d 914 (1998) (interpretation of a contract is a question of law).

Wolfe Electric responds that the trial court acted properly in allowing the jury "to figure out what the contract means."

We essentially resolved this issue in the earlier related discussion about erroneous jury instructions, *e.g.*, Instruction 3. As mentioned there, the contract is clear; it does not prohibit general competition. Consequently, the court erred in denying the motion for judgment as a matter of law and then erred in allowing the jury the opportunity to interpret the contract. The interpretation and legal effect of a contract is a question of law for the court to decide, not a jury. See *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011).

Issue 4: *Miscellaneous issues whose resolution requires appellate court determination of the quantity and quality of evidence should not be decided as a matter of law when the case is being remanded.*

a. *Whether the trial court erred in denying defendants' motions for judgment as a matter of law on the KUTSA claim*

Defendants argue the trial court erred in denying their motions for judgment as a matter of law, both during and after trial, because there was no trial evidence KUTSA was violated by the actual theft of trade secrets. Citing *Bernier v. Merrill Air Engineers*, 770 A.2d 97 (Me. 2001), defendants first specifically contend that four of the eight alleged trade secrets could not meet the KUTSA definition of a trade secret because "they were easily discoverable through reverse engineering." They next claim that even though the remaining four items could be considered trade secrets because they were allegedly stolen, there was no direct evidence that Duckworth stole from Wolfe Electric those tangible items: customer list, vendor list, CAD drawings, and bill of materials. Wolfe Electric simply responds that there was "substantial record evidence" that its trade secrets were misappropriated.

We recently stated our standard of review in *National Bank of Andover v. Kansas Bankers Surety*, Co., 290 Kan. 247, 267, 225 P.3d 707 (2010):

"Appellate courts apply the same standard as trial courts when considering a motion for directed verdict, now known as a judgment as a matter of law under K.S.A. 60-250. See *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007).

> " ' " 'When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict.' " ' [Citations omitted.]" 285 Kan. at 40.

"Stated another way, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); See, *e.g.*, *Smith*, 285 Kan. at 40 ('In other words, a motion for judgment as a matter of law must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party.')."

However, the case is being reversed and remanded to the trial court due to a multitude of erroneous jury instructions and other error, *i.e.*, failure to acknowledge KUTSA's preemption of Wolfe Electric's tort claims that request recovery for damage to trade secrets. Consequently, we do not reach the appellate issues that require us to consider the quantity and quality of the evidence at the first trial. These issues include the defendants' motions for judgment as a matter of law that essentially assert reasonable minds could not reach different conclusions based on the trial evidence. See *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007). We do not reach them because the evidence may be different at a new trial, *i.e.*, whether Duckworth stole the four items from Wolfe Electric that defendants agree "could" be considered trade secrets and whether all items alleged as trade secrets at a new trial could be reverse engineered. See *Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 606, 5 P.3d 1043 (2000) ("Whether a conversion has occurred is generally a question of fact for the jury."); *Chisler v. Byers*, 124 Kan. 200, 205, 257 P. 929 (1927) ("Whether or not there had been a conversion . . . was a question of fact to be determined by the jury under proper instructions.");

*Harvey Barnett v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) ("Trade-secret status is a question of fact.").

Moreover, *Bernier*, 770 A.2d 97, fails to support defendants' argument that reasonable minds could not reach different conclusions based on the trial evidence. That case did not involve a motion for judgment as a matter of law or its equivalent. Rather, the judge acted as the finder of fact in the bench trial, determining on mixed evidence there was no trade secret. The appellate court simply affirmed the trial judge finding by using the deferential "not clearly erroneous" standard of review for factual determinations.

Defendants request a vacation of the entire judgment against them and a remand for new trial. We acknowledge that as a possible alternative to their request, their brief concedes that certain evidence in the record could support a jury award of $50,000.

But we cannot accept the concession, or independently try to determine if the evidence was adequate to support only a verdict of $50,000, because of the overall impact of the confusing, erroneous jury instructions. *Cf. Miller v. Zep Mfg. Co.*, 249 Kan. 34, Syl. ¶ 5, 815 P.2d 506 (1991) (Court concluded jury award of $30,000 for future medical expense was higher than was supported by the evidence. Court also concluded new trial should be ordered because jury refusal to award damages for past medical expenses and pain and suffering was contrary to uncontroverted evidence. And because of a genuine conflict in the evidence regarding liability, court concluded facts indicate the jury failure to award these past damages may have been compromise on liability issue. Accordingly, instead of remanding for new trial on only these past damage issues, court remanded for new trial on all issues.); *Alvarez v. Rendon*, 953 So. 2d 702, 712-13 (Fla. Dist. App. 2007) (inconsistency in jury verdict was product of combination of errors, including jury instructions that were "confusing, inconsistent and incorrect"; proper remedy was new trial because "it is impossible to tell what the jury intended or what it would have intended if it had been correctly told what it had to decide").

### b. *Sufficiency of the evidence to support Wolfe Electric verdict on KUTSA claim*

Defendants raise a virtually identical argument in this issue, claiming that all the trial evidence was insufficient to support the jury verdict for Wolfe Electric on the KUTSA claims. More particularly, defendants again allege that no evidence was presented to prove that they actually stole any trade secrets from Wolfe Electric, and their postverdict motion should have been granted. Wolfe Electric again responds that there was substantial competent evidence for the jury finding the trade secrets were misappropriated.

Our standard of review for sufficiency of the evidence is similar to reviewing motions for judgment as a matter of law:

"When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. [Citation omitted.]" *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 478, 15 P.3d 338 (2000).

While the standard of review is slightly different, our conclusion is the same: Because this function also requires us to consider the quantity and quality of the trial evidence, and because the evidence on remand may be different, this issue currently is inappropriate for appellate resolution. *Cf. Miller*, 249 Kan. at 46-47.

### c. *Adequacy of evidence to support $600,000 award*

Defendants next suggest the trial court erred in denying their posttrial motion for remittitur of damages. As mentioned, in their brief they contend the only evidence of damages presented was testimony that Wolfe Electric made approximately $5,000 profit on each oven sold and that Global sold 10 ovens, for a supportable jury verdict of only $50,000. Their written motion for remittitur more generally argued the evidence supported a verdict of $25,000 against each defendant. Perhaps as further proof of the confusion in this case, their oral arguments to the district court in support of their remittitur motion reveal they held a more expansive view of the evidence supporting the verdict.

In referring to the jury's completed verdict form, defendants first stated they had no problem with loss of profits in the amount of $50,000. But they did have problems with any verdict for loss of opportunity for sales and loss of good will. As for loss of trade secrets and confidential business information in the amount of $50,000, defense counsel acknowledged how the jury could have reached that conclusion based upon the evidence:

"*I can see how the jury could come up with that* by saying, 'okay, well, we got ten ovens that were sold at a profit of $5,000 each. That is item one [on the verdict form], loss of profits. *And then we're going to assess another $50,000 because that's what a trade secret is worth. Or confidential business information or both.* We don't know which that was taken away by Mr. Duckworth and used by Global and Mr. Duckworth at a later time, so we're going to assess damages *for ten ovens, and* we're going to put a value of $50,000 *on the trade secrets.*'" (Emphasis added.)

Defense counsel concluded the defendants had no problem with the additional $50,000 awarded:

"And so we're not really questioning items one [loss of profits] *and* B [actually, item 5—loss of trade secrets and confidential business information—on the verdict form's Question B.]

"Our motion to remittitur goes to everything else . . . loss of opportunity, loss of good will. Simply no evidence that would support any damages being awarded for those items, and I just offer that to clarify our motion for remittitur because we didn't file an extensive brief with regard to that." (Emphasis added.)

Later in the hearing defense counsel explained the crafting of the verdict form and reiterated:

"So now that we have those [specific elements for plaintiff's damages on the form] . . . , the jury came back and said there was $125,000 for lost opportunity and $50,000 for loss of good will. . . . [T]here is no evidence to support those. We should have had a judgment as a matter of law on that. *You can take those out now and just leave certain ones in. For which question conceived [there] was evidence to support them.* That's why the verdict form was crafted the way it was." (Emphasis added.)

Wolfe Electric does not respond directly to defendants' argument; it simply groups the damages arguments together and generally argues that the damages were "supported by the damages testimony of Ron and Gary Wolfe and by the defendants' own evidence of their sales to date. Furthermore, there was evidence

admitted concerning Wolfe Electric's loss of good will from defendants' illegal competition, and the jury made an award accordingly."

We earlier agreed with defendants and concluded insufficient evidence existed for the trial court to submit instructions to the jury on two categories of damages that were asserted in three different causes of action: (1) lost opportunity for sales ($125,000 awarded in each of three causes of action) and (2) loss of good will ($50,000 awarded in each of three causes of action). Consequently, the remaining categories of damages asserted across four different causes of action include: (1) loss of profits from sales ($50,000 awarded in each of three non-KUTSA causes of action); (2) loss of trade secrets and confidential business information ($50,000 awarded in each of three non-KUTSA causes of action); and (3) misappropriation of trade secrets ($50,000 awarded against each of the two defendants in the KUTSA cause of action.) As mentioned earlier, and as partially borne out by defendants' concessions at the remittitur hearing, it is unclear exactly what the jury was finding on even the undisputed damages evidence.

More important, because our function under *Dougan*, 270 Kan. 468, requires us to consider the quantity and quality of evidence, and because the evidence on remand may be different, this issue currently is inappropriate for appellate resolution.

d. *Issue of trial court error in denying Duckworth's motion for judgment as matter of law on one component of breach of contract claim*

In a related argument, Duckworth next claims the trial court erred in denying his motion for judgment as a matter of law on one component of the breach of contract claim. More particularly, he contends Wolfe Electric failed to prove that it had been damaged by loss of any sales to actual customers—active or inactive—as a result of Global's purported solicitation. Wolfe Electric makes no specific response.

Our standard of review is as announced in *National Bank of Andover*, 290 Kan. at 267. However, because this exercise also requires us to consider the amounts of evidence, and because the

evidence on remand may be different, this issue currently is inappropriate for appellate resolution.

Issue 5: *Whether the district court erred in enjoining defendants posttrial from involvement in conveyor pizza ovens is moot.*

Defendants next argue the trial court erred posttrial in enjoining them from being involved, directly or indirectly, in the design, manufacture, marketing, and sale of conveyor pizza ovens for 4 years—2½ years from the order dated May 17, 2007—under K.S.A. 60-3321. They contend Wolfe Electric already had an adequate remedy at law in the form of a $600,000 verdict. Defendants also contend KUTSA required an injunction to terminate when the trade secret ceased to exist. They cite K.S.A. 60-3321(a) and point to testimony of an expert witness of Wolfe Electric who opined that the entire oven could be completely reverse engineered and remanufactured in 3½ months.

Greatly summarized, Wolfe Electric argues it met its burden to satisfy the elements for injunctive relief and discusses how the trial court agreed. It cites *Empire Mfg. Co. v. Empire Candle, Inc.*, 273 Kan. 72, 86, 41 P.3d 798 (2002), to list the elements.

All parties cite *Schlup v. Bourdon*, 33 Kan. App. 2d 564, 567, 105 P.3d 720 (2005), to argue our standard of review. Defendants argue we review de novo, while Wolfe Electric argues we review for abuse of discretion.

We need not answer any of these particular questions because Wolfe Electric fails to address another required element to justify the permanent injunction which it requested and received. A plaintiff is required to show it actually succeeded on the merits of the lawsuit, *i.e.*, after a final determination of the controversy. See *Steffes v. City of Lawrence*, 284 Kan. 380, 394-96, 160 P.3d 843 (2007). Wolfe Electric cannot show this success because we are reversing the jury's verdict and remanding for a new trial on all issues, *e.g.*, liability. Consequently, whether the judge based the permanent injunction upon the jury's now-reversed verdict ("[t]he jury concluded . . . that Defendants misappropriated Plaintiff's trade secrets"), or made his own decision at the injunction hearing after considering the same trial evidence ("and the Court agrees"

with the jury), the permanent injunction simply cannot stand as a matter of law. See *Steffes*, 284 Kan. at 395 ("Without such plaintiff success on the merits, the injunctive inquiry may end under Kansas law."); see *Alvarez*, 953 So. 2d at 712-13 (because case was remanded for new trial on all issues due to inconsistent jury verdict, reversed judgment and permanent injunction); *News America Marketing In-Store, LLC v. Emmel*, 2011 WL 2222040, at *4 (11th Cir. 2011) (unpublished opinion) (permanent injunction requires movant first establish success on merits; accordingly, appellate court's vacation of district court's entry of summary judgment for plaintiff because defendant allegedly breached employment agreement requires vacation of permanent injunction against defendant based solely upon that claim).

We find some guidance in *Thomas v. Texas Dept. of Criminal Justice*, 220 F.3d 389 (5th Cir. 2000). There, a corrections lieutenant sued her employer under Title VII for race and gender discrimination. The jury found race and gender discrimination in the employer's denial of her request for housing, and discrimination and retaliation in the employer's failure to promote her. The trial court then issued a permanent injunction on the housing issue.

On appeal, among other things, the employer argued that the trial court should not have permitted an amendment to plaintiff's housing claim in the pretrial order—which was based entirely upon gender discrimination—to also include an allegation of racial discrimination. Consequently, it argued the court's later charge to the jury also should not have included an interrogatory that asked whether the employer discriminated by denying plaintiff housing on the basis of both gender and race.

The Fifth Circuit Court of Appeals agreed with the employer. It held that plaintiff's charge with the EEOC regarding her housing complaint fairly alleged only gender discrimination. It ruled that the court's error did not affect the claims of retaliation and failure to promote because they were the subject of other jury interrogatories. The verdict on these latter claims was affirmed, but the verdict on the housing claim was "reversed and remanded for trial consistent with" the Fifth Circuit's opinion. 220 F.3d at 396. Of importance to the instant case is the court's ruling that because the

permanent injunction pertained only to the housing claim, and because it in turn relied upon the verdict entered after the erroneous housing claim amendment to the pretrial order and the erroneous attendant jury interrogatory, the injunction was erroneous and was therefore vacated.

Similarly, the trial court's posttrial award of attorney fees must be reversed as well. As Wolfe Electric admits in its brief, "the attorney fees award . . . necessarily rises or falls with the trade secrets claim." Moreover, the fees award was based entirely upon the trial evidence allegedly demonstrating willful and malicious misappropriation of trade secrets under K.S.A. 60-3323. That finding, with the others, is necessarily reversed.

Reversed and remanded.

DAVID J. KING, District Judge, assigned.

\* \* \*

JOHNSON, J., dissenting: I agree with the majority's determination that the jury instructions proffered by the plaintiff, Wolfe Electric, Inc., were erroneous with regard to the acts which could support a finding of liability on the part of the defendants. I also agree that the errors cannot be deemed harmless on the question of defendants' liability. Where I part company with the majority is on the question of damages; I would not grant plaintiff a new trial on that issue.

Regardless of the acts which plaintiff alleged rendered defendants legally liable, plaintiff still had the burden of proving that it had sustained damages because of defendants' actions. As the majority suggests, the only evidence of damages in the record before us is the alleged loss of a $5,000 profit on each of the 10 ovens that Global sold, for a maximum total damages of $50,000. I see no reason to give the plaintiff another opportunity to try to prove

additional damages, just because the plaintiff's contentions on liability were so overbroad and erroneous as to require a new trial on liability.

The majority declined to address the defendants' claim that the trial court erred in denying their posttrial motion for a remittitur of damages to the $50,000 for which there was evidence. The majority's rationale for avoiding the issue is that the evidence might be different at a retrial. I disagree with that tack on two levels.

First, even if there is a retrial on the damages, the trial court and the parties should be advised if a majority of the court would find that the evidence in the first trial was insufficient to support the jury's award of damages. Otherwise, the matter might return to us after retrial with exactly the same question based on exactly the same evidence. In that context, the sufficiency of the evidence of damages is not a moot issue.

Second, the proffered rationale strikes me as a bit circular. We will not consider the issue now because different evidence might be admitted at retrial, and there will be a retrial on damages because we are not considering the sufficiency of the evidence issue now. I see the issue of the sufficiency of the evidence of damages as a separate and distinct issue.

The plaintiff's ability to introduce evidence of its damages was not hampered or affected by the trial errors giving rise to our reversal on liability. Reducing the number of acts which could give rise to the defendants' liability certainly would not have the effect of increasing the damages suffered by the plaintiff. If anything, the opposite would be true.

In short, the sanction for failing to carry one's burden of proof should not be an opportunity to do it again. I would have found that the trial court erred in denying the defendants' motion for remittitur and that on remand the plaintiff's damages are limited to no more than $50,000.