NOT DESIGNATED FOR PUBLICATION

No. 116,998

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CASE & ASSOCIATES PROPERTIES INC.
d/b/a ASPEN PARK APARTMENTS,
*Appellee*,

v.

JODIE L. BRIBIESCA,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFF DEWEY, judge. Opinion filed August 3, 2018. Affirmed in part and remanded in part with directions.

*Jodie L. Bribiesca*, appellant pro se.

*Patrick Turner*, of Shultz Law Office, P.A., of Wichita, for appellee.

Before SCHROEDER, P.J., MALONE, J., and STUTZMAN, S.J.

PER CURIAM: Jodie Bribiesca lived in two apartments in the same complex in Wichita, Kansas, owned by Case & Associates (Case). She entered into a lease for the second apartment, sight unseen, for a term from January 9, 2016, to September 30, 2016. When she moved in she found numerous problems in the new apartment. Case's maintenance staff worked on the cleaning and repair requests she submitted, but in several instances failed to remedy the concerns to her satisfaction. Eventually, not long before the end of her lease, Bribiesca reported her concerns about the apartment to code inspectors at the City of Wichita. About a month before the term expired, Case offered to

1

renew the lease, but before Bribiesca accepted that offer, Case delivered to her a 30-day notice to move out on October 31, 2016.

Case filed a petition for possession of the apartment. Bribiesca responded with an affirmative defense to Case's petition, claiming retaliation by Case for her complaints to the City of Wichita, and counterclaims for rent, utility payments and other relief. The parties appeared before the district court for trial, and the court granted Case's petition for possession of the apartment and denied relief on Bribiesca's counterclaims except for an order that Case make an accounting for the security deposits.

Bribiesca timely appeals. We find no error by the district court and affirm in all but one respect. We remand for further action by the district court to resolve remaining questions concerning the security deposit accounting.

FACTS AND PROCEDURAL BACKGROUND

Bribiesca first moved to Aspen Park Apartments (Aspen) on June 10, 2015. The apartments are located in Wichita and are owned by Case. On January 8, 2016, Bribiesca moved from her first apartment, unit 1812, to another, 1908, in the same complex. Bribiesca testified she was not offered an opportunity to see 1908 before moving in, and it is not clear whether she asked to view the apartment before the move. The lease term for 1908 was from January 9 to September 30, 2016. Except for some drip pans, there were no damage issues for 1812 when Bribiesca moved out.

Bribiesca had problems with 1908 from the start. She described the apartment's smell when she walked in as "musty, moldy, [and] dirty" and testified "[t]he apartment was still very dirty." At the trial, the property manager viewed photos Bribiesca took when she moved in and commented "[t]here would've been work to be done if I would see an apartment in this shape." Bribiesca testified to water stains at various places in the

2

apartment, missing drywall in a utility closet, mold in a corner of the master bathroom tub, the washer and dryer hookup that had not been cleaned, and several other deficiencies. She acknowledged some of her initial complaints were addressed after she had moved in.

Shortly after she moved in, Bribiesca noticed mold around the HVAC system, detached ductwork, and a dirty evaporative coil. Maintenance resolved the detached ductwork with foil tape and cleaned the evaporative coil, but Bribiesca testified the duct still leaked air and she cleaned the evaporative coil further to meet her standards. After several months, Bribiesca began to notice "black chunks coming out of [the] vents" in her apartment. She cleaned and inspected the duct and knew it to be clean. After complaining, maintenance staff offered to clean the ducts, but she told them she had already done that. Bribiesca then decided to "remove the lid" on the HVAC unit, where she said she found mold on the inside of the door and on the blower wheel. The maintenance staff replaced the blower wheel but, according to Bribiesca, refused to clean the mold from other parts of the air conditioning unit. Bribiesca testified she felt "absolutely horrible every day" after moving into the apartment and her daughter's asthma had "been in overdrive."

Bribiesca claimed her air conditioning could not keep up and was constantly running. Maintenance looked into this issue at least three times, claiming the air conditioner was functioning as it should. Bribiesca also discovered her dryer was not venting to the outside, but into the air space between apartments. As a result, she believed air from the dryer and from outside was being pulled into the air conditioning system through the holes in her utility closet. Additionally, Bribiesca thought the bathroom ventilation fans were similarly venting into the ceiling, since no outside vents opened when the fans turned on. In an attempt to deal with her dryer getting hot on the outside, Aspen's maintenance staff ran a new dryer vent to outside of the building using a flex pipe which, through her experience in remodeling, was "was not to code."

3

In her trial testimony, Bribiesca said the apartment's management told her she had filed too many maintenance requests and she felt the issues were not being properly addressed, so she contacted the city inspection office on September 2, 2016. The first inspection occurred on September 15, 2016, and that inspector cited violations for the holes in the utility closet and attempts to fix missing drywall with foil tape. He told Bribiesca, however, a building inspector would have to come to look at the dryer and bathroom venting problems. In late September, Bribiesca noticed what had previously been a water stain in the coat closet had escalated to a water stain with mold. The building inspector came on October 27, 2016, and found violations in both bathrooms for the ventilation fans not venting to the outside and another for the new dryer vent not being installed to code.

Case contended it worked to resolve all of Bribiesca's maintenance requests to the best of its abilities and never decreased its services to her because of her complaints. The initial problems recognized by the first city inspector were corrected to the City's satisfaction while Bribiesca was still in the apartment. Because of the scope of the correction for the dryer ducting problem cited on the second city inspection, Case was obtaining permits and contracting with vendors to do the work, but it would only begin once the apartment was vacant. Case submitted 43 pages of records showing when and how it resolved each of Bribiesca's maintenance requests.

Bribiesca received a lease renewal offer on August 31, 2016. The lease renewal offer stated it would "expire 30 days at [the] end of business of the date this notice was given." Case then decided to withdraw the renewal offer and issue Bribiesca a 30-day notice to vacate, which Aspen prepared and posted on Bribiesca's door on September 28, 2016. The notice was dated September 30, 2016, and stated Bribiesca needed to vacate the apartment by October 31, 2016. In response, Bribiesca sent a letter to Aspen charging the 30-day notice to vacate was in retaliation for her complaints to the city inspectors, violating K.S.A. 58-2572. Bribiesca had not entered into a lease renewal before she

4

received the notice to vacate, although she had expressed her intent to renew to a person from Aspen's office who had called her.

Case filed a petition for possession of the apartment on November 1, 2016. Also around the first of November, Aspen refused Bribiesca's offer to pay the November rent and water bill. Bribiesca answered the eviction petition on November 7, 2016, asserting violations of K.S.A. 58-2572 and K.S.A. 58-2553 as affirmative defenses. Additionally, Bribiesca counterclaimed for: (1) dismissal of the eviction; (2) return of all of her rent through violation of implied warranty of habitability; (3) correction of all K.S.A. 58-2553 violations in the apartment; (4) $280.91 for high utilities; (5) $292 remaining from her unit 1812 security deposit; (6) a new lease with fair market rental values; (7) moving costs, if forced to move; and (8) under the provisions of K.S.A. 58-2563, Case should pay "1 1/2 times the total of all the damages" from the counterclaims per K.S.A. 58-2563. The bench trial took place on November 15-16, 2016, and the district court announced its ruling from the bench on November 18, 2016.

After reviewing the evidence and law, the district court found there was a lease, an offer to renew, and a 30-day notice that rescinded the renewal offer without the lease being renewed. Bribiesca's written lease expired on September 30, 2016, so her status changed to month-to-month tenancy on October 1, 2016. The 30-day notice to vacate was delivered before October 1, 2016, and acted to terminate the month-to-month lease on October 31, 2016. The district court noted that Case had refused payment of Bribiesca's November rent in keeping with its intent to recover possession through the court case. Based on the evidence, the district court ordered possession restored to Case and directed Bribiesca pay prorated rent for November until she moved out.

In general terms, the district court granted Bribiesca's counterclaim regarding an accounting for all funds she paid for security deposits, including any pet deposit, and return of funds still held unless damage could be substantiated to support a deduction; the

court found all other counterclaims should be denied. The court found Case did not raise Bribiesca's rent or evict her in retaliation for her actions and that it lacked authority or evidence to grant relief on the other counterclaims. The district court stated the primary remedy available to Bribiesca had been to give Aspen notice of material noncompliance with the lease or material health or safety issues, which then would have allowed her to terminate her lease within 30 days if a good-faith remedy was not in progress within 14 days of the notice—a procedure outlined in K.S.A. 58-2559.

Bribiesca timely filed her notice of appeal on November 21, 2016. On November 28, 2016, the district court held a hearing on Bribiesca's motion for a hearing on a stay of writ of restitution. At the time of the hearing, Bribiesca had already been evicted from her apartment. The district court set a supersedeas bond of $3,352 along with $1,036 in rent and water cost. Upon payment of those amounts Bribiesca would be restored to the property pending this appeal. The record does not clearly show whether Bribiesca posted the bond.

ANALYSIS

Bribiesca presents these issues: (1) the district court erred in ruling her only remedy available for Case's violations of K.S.A. 58-2553 was the 30-day notice procedure in K.S.A. 58-2559; (2) the district court disregarded evidence showing maintenance failures and code violations; (3) the district court erred when it found no retaliatory eviction; (4) the district court erred when it found no authority to return the rent she had paid; (5) the district court erred when it did not award damages for the pet deposit for which the court ordered an accounting.

6

*K.S.A. 58-2559 notice of termination as remedy*

For her first issue, Bribiesca contends the district court "erred in ruling that the only remedy available to the defendant for the landlord violating his duties of maintenance . . . was to issue a 14/30-day notice per K.S.A. 58-2559." She argues her options for relief were not limited to giving that notice and states she was concerned Case might prefer termination of the lease so it could leave the maintenance issues unresolved for the next tenant. She points out that K.S.A. 58-2559(b) presents an alternative for damages and injunctive relief if a tenant proves noncompliance with the lease or K.S.A. 58-2553.

Bribiesca is correct that she could claim violation of K.S.A. 58-2553 without giving a K.S.A. 58-2259(a) 30-day notice demanding Case begin remedial work in good faith within 14 days. *Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345, 771 P.2d 79 (1989). K.S.A. 58-2559(b) also permits a tenant to recover damages and obtain injunctive relief when a landlord fails to comply with K.S.A. 58-2553. If a trial court finds a landlord has failed to comply with an obligation set by K.S.A. 58-2253, a tenant may recover damages in the amount of "the difference between the fair rental value of [the] apartment as it should have been and the fair rental value of the apartment as it actually was, insofar as the difference resulted from [the landlord's] breach of its statutory duties." 13 Kan. App. 2d at 345.

Here, the district court did not discuss Bribiesca's claims and evidence in light of K.S.A. 58-2559(b), but neither did it find her relief was limited exclusively to the 30-day notice process in K.S.A. 58-2559(a). The district judge did, as Bribiesca claims, observe that the 30-day notice procedure was "really the primary avenue that the defendant had," and said that if Case then failed to make the repairs, she could "move to a place that's more to her liking."

7

Bribiesca concludes her discussion of this issue in her brief by declaring "[she] was within her rights to pursue other remedies." We do not disagree with that statement or question her reasons for not taking the 30-day notice path. Notably, however, she does not contend she pursued either of the alternate remedies of K.S.A. 58-2559(b) in the district court, by either presenting evidence on the diminished rental value of her apartment as discussed in *Love* or seeking injunctive relief. This argument presents no basis for relief.

*District court's consideration of Bribiesca's evidence*

Bribiesca next contends the district court found only that her apartment was "not to her liking," disregarding her evidence that Case failed in its maintenance duties and that city inspectors issued citations for violations. When a verdict or trial court decision is challenged for insufficiency of evidence or as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the verdict will not be disturbed on appeal. *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). Especially applicable to this issue, finding that a party did not meet its burden of proof is a negative factual finding. In reviewing a negative factual finding, the appellate court must consider whether the district court arbitrarily disregarded undisputed evidence or relied upon some extrinsic consideration such as bias, passion, or prejudice to reach its decision. *Owen Lumber Co. v. Chartrand,* 283 Kan. 911, 928, 157 P.3d 1109 (2007).

Bribiesca bore the burden of proving the assertions in her counterclaims to be more likely true than not. After reviewing the evidence, however, the district court denied all of her counterclaims, with one exception—the court generally ordered a security deposit accounting, with Case to issue any refund owed. The district court's judgment against Bribiesca on her counterclaims necessarily included its finding that she failed to

8

prove the claims that Case violated K.S.A. 58-2553. This was a negative factual finding for which the standard of review is difficult to overcome. Bribiesca must show the district court arbitrarily disregarded undisputed evidence or relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision. *Chartrand,* 283 Kan. at 928.

Through her testimony and exhibits, Bribiesca presented evidence on the conditions in her apartment that she contended were violations of K.S.A. 58-2553(a)(1) and (3). Case argues it responded to Bribiesca's complaints with needed maintenance or repairs.

The venting in the apartment for the clothes dryer was one of Bribiesca's major issues. In response to Bribiesca's claim that the dryer did not vent to the exterior of the building, Case initially resolved this issue by running a new vent to reroute the dryer exhaust. The second of two city inspectors who responded to Bribiesca's complaints came on October 27, 2016. That inspector found the replacement dryer vent did not meet code requirements and also found code violations for two bathroom ventilation fans that did not vent to the outside. Case felt it could not complete the work with Bribiesca in the apartment, but began the process of obtaining permits to complete the work after she moved out. The problems identified by the first city inspector were corrected to the City's satisfaction while Bribiesca was still living in the apartment.

Through its exhibits, Case tried to show that every time Bribiesca had a maintenance issue, Case worked to resolve it. And, with the exception of the photos showing what Bribiesca considered to be the insufficiently cleaned air conditioning coils and insufficiently remedied ductwork, there are no photos in the record documenting the condition of the problems after Case was given an opportunity to resolve them.

9

The district court's decision, therefore, came down to evaluation of evidence, some conflicting and some not, to determine whether Bribiesca had met her burden of proof for each of her counterclaims. As we stated above, it is not our role to repeat the trial process, substituting our once-removed assessment of the evidence for that of the trial judge who was present with the parties. We see nothing to support any claim that the district court arbitrarily disregarded undisputed evidence or relied upon some extrinsic consideration such as bias, passion, or prejudice to reach its decision. *Chartrand,* 283 Kan. at 928. We do find evidence in the record which, viewed in the light most favorable to Case as the prevailing party, supports the district court's judgment. Accordingly, there is no basis to overturn the district court's denial of Bribiesca's counterclaim for damages arising from a failure by Case to fulfill its maintenance obligation.

### *Retaliation for complaints to Case and the City of Wichita*

Bribiesca next raises two related arguments based on the district court's rejection of the claims that Case raised her rent and retaliated against her because of her maintenance complaints. Case denies any attempt to evict Bribiesca through a rent increase. The district court found the rent increases proposed in Case's renewal offer "were fairly modest" and saw no proof the increases were proposed in bad faith. Bribiesca raised retaliatory eviction claim as an affirmative defense. "The party raising an affirmative defense also bears the burden of proving the defense." *Munck v. KPERS*, 35 Kan. App. 2d 311, 322, 130 P.3d 117 (2006).

Bribiesca received a lease renewal offer on August 31, 2016, that expired "30 days at end of business of the date this notice was given" [*sic*]. The offer proposed varying rents—lower for the longest, one-year extension, than for either a six-month or month-to-month lease. A one-year renewal would have increased the base monthly rent $14 over the amount Bribiesca was paying; a 14-month renewal would have increased the base rent by $6 per month. We note as well that Bribiesca received the renewal offer with the

10

"retaliatory" rent increase on August 31, 2016, *before* she complained to the City of Wichita on September 2. To find retaliation, therefore, we would be required to accept the incongruous idea that retaliation can occur *prior to* the event that allegedly triggers it.

On September 28, 2016, prior to acceptance of the renewal offer which had been set to expire at the end of business on September 30, 2016, Bribiesca received from Case a 30-day notice of termination of tenancy and notice to vacate. Since Bribiesca had not accepted the renewal offer prior to receiving the notice to terminate, the district court correctly found the 30-day notice acted to rescind the renewal offer.

Bribiesca argues the district court incorrectly stated the lease renewal offer contained "no time frame" for it to be accepted. That error, however, is of no consequence since Bribiesca did not accept the lease renewal offer before its stated expiration and the termination of her lease on September 30, 2016. Moreover, Bribiesca's October rent, which became month-to-month after the lease expired without renewal, was the same amount as in the original lease, $747 ($707 per month plus $40 per month for pets). Since Bribiesca's rent was not increased, deciding whether the proposed rent increase in the lease renewal offer was made in retaliation has no bearing on this appeal.

Bribiesca also had the burden to prove the other part of her affirmative defense that asserted Case generally took action to evict her in retaliation for her complaints both to Case and the City about conditions in her apartment. Bribiesca maintains this violates K.S.A. 58-2572, which constituted her affirmative defense against Case's action for possession of the apartment. Bribiesca proposes a "but for" test as decided in an Oregon case, i.e. "but for" the tenant's conduct, the landlord would not have evicted the tenant. *Elk Creek Management Co. v. Gilbert*, 353 Or. 565, 584, 303 P.3d 929 (2013). Under this test, Bribiesca argues her eviction would not have occurred "but for" her reports to the City and complaints of violations under K.S.A. 58-2553. Importantly, however, she does

11

not support her argument with any reference to adoption of that test by our appellate courts.

In response, Case argues that no provision of Kansas law requires a landlord to enter into a renewal after a lease expires and its offer of renewal was rescinded when it notified Bribiesca of its decision to terminate, rather than renew, her tenancy.

K.S.A. 58-2572(a) states: "a landlord may not retaliate by increasing rent or decreasing services after: (1) the tenant has complained to a governmental agency . . . or (2) the tenant has complained to the landlord of a violation under K.S.A. 58-2553." If a landlord violates the statute, a "tenant is entitled to remedies provided in K.S.A. 58-2563 and has a defense in an action against such tenant for possession." K.S.A. 58-2572(b). We have already addressed Bribiesca's argument concerning increased rent and she cites no "services" that Case allegedly diminished because of her complaints. Her arguments are that: (1) Case did not repair to her satisfaction all defects she claimed existed in the apartment; and (2) Case decided to rescind its renewal offer and not enter into another lease with her. We find no error in the district court's rejection of Bribiesca's affirmative defense and its order granting possession of the property to Case.

*Refund of all rent; moving costs; excess utility costs; punitive damages*

Bribiesca next contends the district court erred when it found no authority to order refund of all rent she had paid for her apartment throughout her tenancy, plus moving costs, "excess" utility costs, and punitive damages. Case responds there was no basis for any damages since the district court did not find it had materially failed to comply with its duties under either the lease or K.S.A. 58-2553. Further, Bribiesca had made no punitive damage claim before the district court.

12

Case is correct that the issue of punitive damages was not asserted to the district court using the procedure directed by K.S.A. 60-3703, or in any other form. Issues not raised before the district court cannot be raised on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). As we stated above, the district court rejected all of Bribiesca's claims and defenses except for the order for Case to account for her security deposit. The district court had no findings upon which to award damages.

Bribiesca also claims Case violated the implied warranty of habitability, which justified an order from the district court for the damages she wanted. The record supports her contention that she "stated numerous times there were major maintenance issues affecting her health and safety and the warranty of habitability." The record also shows, however, that the district court denied Bribiesca's affirmative defense of retaliation and all of her counterclaims that were based on her argument that Case failed to perform cleaning or maintenance and make necessary repairs in response to her complaints.

Although Bribiesca reasserts her position that the district court should have ordered Case to refund all of the rent she paid during her tenancy, she did not present evidence that the apartment was absolutely valueless. As the district judge commented, she had the benefit of occupancy for most of a year and asked to stay longer. Her evidence was at odds with the relief she sought. Bribiesca now contends the court could have ordered her excess utility costs paid as a consequence of violation of the lease and K.S.A. 58-2553, and could have ordered her moving costs paid "due to [her] being forced to vacate the apartment due to the retaliatory action and eviction." Those arguments ignore the fact that the district court found she had presented no evidence to justify a finding her utility costs were actually excessive, and the court also rejected her affirmative defense based on retaliation.

13

The district court evaluated Bribiesca's numerous claims and the evidence she presented and rejected them. We have found the record contains substantial competent evidence to support the district court's decisions, and we decline Bribiesca's invitation to substitute our evaluation of the evidence for the district court's.

*Security deposit; pet deposit*

Bribiesca's final issue is her contention that the district court erred in failing to award the damages she argues were required because Case failed to return her pet deposit after she left her first apartment. She contends since no pet damage was listed on the move-out sheet from that apartment, she was entitled to the $292 pet deposit, plus one and one-half times the amount of the pet deposit for damages per K.S.A. 58-2550(c).

Case first points out the district court did not specifically order refund of a deposit, but instead ordered an accounting for the deposit. Case then invokes a lease provision stating that a pet deposit made for two pets is not refundable—and asserts Bribiesca had two pets.

The district court addressed the security deposit question in some detail but still left questions unanswered. At the outset, however, the court did compare the leases for Bribiesca's two apartments and found both used the same lease form. The district judge also recalled from the testimony that the "regular part" of the deposit for the first apartment had been returned, less a charge for some drip pans. Then the court commented:

> "[I]t appears as though, in addition to the regular deposit, there was an additional animal deposit paid. And I'm not altogether sure, then, whether there was an additional deposit. I know that the [apartment] 1812 regular deposit was refunded. There may have been an additional deposit paid for [apartment] 1908."

14

The court then referred to a lease paragraph that required the landlord to account for the deposit and refund amounts found due to the tenant and ordered Case to do that. From the district court's order, however, it is not clear whether the ordered accounting refers to unit 1812 or 1908, or both. The court said:

> "In other words, there needs to be an accounting of all funds that [Case has] received for deposit, including the original [$]292 pet deposit. And then, if there are offsets, those can be deducted, and the balance should be refunded to [Bribiesca]. And by 'offsets,' I mean pet damage or extraordinary damage."

The district court finally ordered Bribiesca to pay rent until she relinquished possession of her apartment, prorated as necessary for any partial month.

Based on its argument, Case appears to assume it was ordered to account for Bribiesca's second apartment, while Bribiesca's argument centers on the claim she is entitled to damages related to a failure to refund the pet deposit for the first apartment. The "Animal Addendum" to the lease agreement for the second residence, unit 1908, does have a typed addition that states having two pets makes the renter ineligible for refund of a "pet deposit." But in an earlier paragraph of that same addendum a selection was specifically made to consider the "animal deposit" as part of "the general security deposit for all purposes," potentially removing it from any pet-specific provisions. Also, the district court made no findings with respect to the number of pets Bribiesca had in the first apartment or any provision in that earlier lease limiting a pet deposit refund to one-pet situations.

These questions involving the two leases require facts not contained in the record. Those facts and how they relate to the lease provisions determines whether Bribiesca's claim for damages under K.S.A. 58-2550(c) has merit. As a result, the case must be remanded to the district court to resolve those deposit questions.

15

Affirmed in part and remanded in part with directions.