NOT DESIGNATED FOR PUBLICATION

No. 119,369

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
J.S.,
A Minor Child.


MEMORANDUM OPINION


Appeal from Shawnee District Court; MARY E. CHRISTOPHER, judge. Opinion filed November 16, 2018. Affirmed.


*Rachel I. Hockenbarger*, of Topeka, for appellant natural father.


*Michael F. Kagay*, district attorney, and *Morgan L. Hall*, deputy district attorney, for appellee.


Before GARDNER, P.J., GREEN and SCHROEDER, JJ.

PER CURIAM: Father appeals the termination of his parental rights to his son, J.S. The record before the district court was extensive. We have reviewed the record and find no error by the district court. We affirm.


FACTS

The family's first contact with the Department of Children and Families (DCF) was in 2013 but in 2014 it concluded unsuccessfully. DCF opened another case in 2015 and it was also unsuccessfully concluded because the family failed to participate. In January 2016, the State filed a petition alleging J.S., born in 2011, was a child in need of care (CINC), and the district court entered temporary custody orders placing J.S. in the custody of the secretary of the DCF. The court adjudicated J.S. as a CINC and found

1

reintegration was a viable goal. In December 2016, the court entered an order adopting the concurrent goals of reintegration and adoption.

In February 2017, the State moved to terminate Father and Mother's parental rights. The district court later terminated Mother's parental rights through a journal entry dated November 6, 2017. The court then held a three-day termination hearing for Father in April 2018.

Father began working at Big Hearts Pet Brands on the night shift around January 2016. He was arrested in June of 2016 for domestic battery and was incarcerated for about two months, but upon release, he returned to the night shift at Big Hearts Pet Brands. He maintained this job throughout the case.

Case managers testified Father's work schedule concerned them because he never offered a good plan for J.S.'s care when he was at work. He claimed his former wife—not Mother—would provide care. It appears from the record this was an offer for occasional help—not fulltime. Father discussed changing shifts, but never followed through.

When the case started, J.S. was developmentally delayed and needed speech therapy. He also had braces on his legs and needed occupational therapy to help with walking and sitting properly. Father had no transportation to help get J.S. to his various medical appointments and was not aware of all the appointments J.S. needed to attend.

As the case progressed, Father generally lived at the Topeka Rescue Mission. For a few months before his arrest in 2016, Father and Mother lived in an apartment. Upon his release from jail, he returned to the Mission. Father discussed moving from the Mission but never did. All attempts to reintegrate J.S. with Father occurred at the Mission.

Several case managers testified that living at the Mission made it hard for reintegration to work, but it was not an absolute bar to stop it from happening. J.S. told one of his doctors that he had been sexually abused there, but DCF never substantiated the allegations.

Father felt the Mission was suitable housing. He believed it was safe because it had a separate, secured area for women and families. He knew of J.S.'s allegations of sexual abuse at the Mission, but he added the allegations were unsubstantiated and he did not know what J.S. was talking about.

Father also testified that he struggled to find housing because of his prior evictions and convictions and he could not qualify for many other housing options. For example, the Mission had a "shelter plus," but it was only available to people with mental illness or mental disabilities. He said he could not live at Cornerstone because he got paid on a Friday but rent was always due on the first of the month, and he could not go through the Topeka Housing Authority because of his domestic battery conviction. At the termination hearing, Father testified he had talked to his friend's landlord and was waiting to see if he could rent one of his houses.

Before Father went to jail in June 2016 for battering Mother, he and Mother had weekly visits with J.S. After he was released from jail in July 2016, Father resumed visits without Mother. The reintegration plan required Father to take a batterer's intervention program but he never did, claiming financial problems derailed his completion. J.S.'s relationship with Father changed after his arrest. Father testified before his arrest, J.S. had been happy, playful, and cheerful in visits. A case manager also said Father and J.S. interacted well together. After Father got out of jail though, J.S. seemed hostile. J.S. acted out, his behavior progressively worsened, and his speech regressed after the visits. His foster family reported seeing "increased behaviors" when visits resumed.

Father's last visit with J.S. was in October 2016. At the visit, J.S. seemed angry; he threw toys at Father and tried to run out of the room. He also said he was going to run away. Father hardly interacted with J.S. during the visit. Ryan Ozias, J.S.'s therapist at Christ First Counseling, recommended visits be stopped to stabilize J.S.'s behavior. After the visits with Father stopped, J.S.'s speech and behavior improved.

Ozias testified J.S. was physically aggressive and would wet and defecate in his pants at the beginning of the case. He had also shown a split personality at the initial referral. J.S. called himself by his full first name, J. and said J. was good. His parents had called him J.J., and he said J.J. was bad. Ozias diagnosed J.S. with posttraumatic stress disorder and adjustment disorder. He also testified Mother's violent behavior and the fighting between his parents had traumatized J.S.

Ozias still did not recommend visitation with Father. J.S. had expressed he did not want to see or be around his parents. He did not talk about his parents a lot. Ozias testified J.S.'s behavior had stabilized over the course of his treatment. He was less aggressive. And while he still got upset, his behavior was not as concerning. Ozias attributed much of that to J.S.'s foster family, who provided services and structure for J.S.

Foster Mother testified J.S. had many behavioral issues when he first came into their home. He cried, threw tantrums, and had night terrors; he was also malnourished and sick. But he slowly improved over time.

After KVC terminated Father's visits with J.S., KVC did not hear from him until the end of November and then contact was sporadic. The managers sent letters, but Father did not respond. Father claimed that he either did not get the letters or he was unable to reach anyone when he called.

Father returned in April 2017 wanting to reintegrate. A case manager met with Father to make a case plan. She also sent a referral for a parenting assessment and another referral for family therapy.

The parenting assessment occurred in June 2017 with Dr. Stephen Hazel. Before the assessment, J.S. hid and had to be prompted to go in the room. When he entered, he threw toys and said he wanted his foster parents to be his parents. Father tried to calm him down and divert his attention. J.S. eventually calmed down, but he got upset again about 30 minutes later. During the assessment, J.S. said he was mad at Father because Father did bad things to Mother.

Father overslept for the second assessment with Hazel and showed up an hour late. Because Father was not there, Hazel interviewed just J.S., who said he did not like Father because Father did bad things like spanking.

Father, Hazel, and KVC tried to reschedule another assessment but could not get one scheduled. Hazel was unable to draw any therapeutic conclusions because he needed more time to interact and talk with Father and J.S. Hazel testified J.S. seemed mad at Father but not afraid.

Greg Seuferling was assigned as the family therapist in May 2017 for outpatient therapy. Seuferling's initial intake with J.S. reflected J.S. did not want to see Father. Seuferling met with J.S. six times between June 2017 and September 2017. He continued to ask J.S. if he wanted to see Father, but J.S. always said no. Seuferling texted Father at times and believed Father wanted to participate in family therapy, but ultimately, nothing came of it because Seuferling did not think family therapy was in J.S.'s best interest. J.S. would get anxious and dysregulated before and after meeting with Seuferling. He also acted out and became physically ill.

Father said he did not know why J.S. did not want to see him. He could not think of a traumatic event involving J.S. and himself. He believed "there's something else that's pushing him to do this" and "it's stemming from his mother more than me." Father testified Mother was violent toward him. The violence started in 2009. Father claimed she had "pretty much calmed down" for a couple of years. But the violence escalated again after J.S.'s birth when she became addicted to pain pills.

Father testified he was unaware of Mother's violent behavior toward people other than himself. He did not know Mother attacked her mother. He was also surprised when he learned about the multiple assault allegations to start the CINC petition. At first he was skeptical of the allegations but then he saw photographs of the burn marks on the victim's body. Father testified he had not been afraid to leave J.S. in Mother's care before he learned of the assault. The assault allegations changed his mind "maybe a little bit," and he was no longer comfortable leaving J.S. in her care.

Father said he ended his relationship with Mother shortly after he got out of jail because she was cheating on him. They had decided to get divorced.

During the case, Father went through at least five case managers or coordinators. Father generally complied with his case plan tasks at the beginning of the case. He kept KVC updated on his contact information. He never had a positive urinalysis. After his release from jail in 2016, until October 2016, he met with KVC every month.

At the end of the hearing, the district court terminated Father's parental rights. The court found there was clear and convincing evidence of family instability, Father's inability to maintain stable housing, Father's issues related to budgeting and finances, and Father's failure to provide a safe living environment when J.S. was in his care. The court then found Father was unfit, his conduct or condition was unlikely to change in the foreseeable future, and termination of Father's parental rights was in J.S.'s best interests.

6

On appeal, Father argues the district court erred in finding he was unfit and unlikely to become fit in the foreseeable future. The Kansas Legislature has specified the State must prove by clear and convincing evidence the facts to support termination of parental rights. K.S.A. 2017 Supp. 38-2269(a).

The district court found Father unfit under these factors:

- K.S.A. 2017 Supp. 38-2269(c)(1): "[f]ailure to assure care of the child in the parental home when able to do so;"
- K.S.A. 2017 Supp. 38-2269(c)(2): "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child"
- K.S.A. 2017 Supp. 38-2269(b)(8): "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child;"

"When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, this court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The Revised Kansas Code for Care of Children (RKCCC) provides the procedure for the district court to use when considering the termination of parental rights. K.S.A. 2017 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in

7

determining unfitness. K.S.A. 2017 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2017 Supp. 38-2269(c). Any one of the factors in K.S.A. 2017 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f).

*Statutory factors*

Father argues KVC did not do enough to help him find housing. But case managers testified they discussed housing options with Father. One case manager also testified that in the past she had used resources such as Cornerstone or private rental management companies willing to work with KVC to arrange housing—even for parents who had evictions, but she could not provide these services because Father never was in contact with her.

While Father was employed for the entirety of the case, he worked the night shift. Father proposed two people who had offered to help watch J.S. while he worked, but the record is unclear if either would be a reliable resource. Although Father discussed changing his shift to make child care arrangements easier, he never did so.

Father claims the public and private agencies assigned to help him did not do enough to help rehabilitate the family. K.S.A. 2017 Supp. 38-2269(b)(7) requires public and private agencies make reasonable efforts to rehabilitate the family, and when those efforts fail, a finding of parental unfitness may be appropriate. Father does acknowledge agencies need not exhaust all resources or make a "herculean effort" to rehabilitate a family. *In re J.L.*, 116,293, 2017 WL 1832348, at *4 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. 987 (2017). But Father urges this court to change the statutory standard and require agencies to make effective efforts.

8

To begin with, Father did not raise this argument before the district court; he cannot raise it now. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011) (holding issues not raised before the trial court cannot be raised on appeal). And the district court did not find Father unfit under K.S.A. 2017 Supp. 38-2269(b)(7). We find it unnecessary to change the agencies' obligation.

Additionally, another panel of this court has rejected this argument, explaining

"Mother's contention that the statute should be interpreted to require *effective*, rather than reasonable efforts to achieve rehabilitation of the family lacks merit for two reasons. First, it is contrary to the language of the statute itself and our well-developed body of caselaw surrounding what constitutes 'reasonable efforts.' Second, and equally important, basic logic compels the conclusion that requiring 'effective efforts' of public and private agencies would allow parents to easily defeat the purposes of the statute, i.e., the protection and care of children, simply by not cooperating with those agencies." *In re L.C.P.*, No. 118,841, 2018 WL 4039170, at *8 (Kan. App. 2018) (unpublished opinion), *petition for rev. filed* September 21, 2018.

Father next asserts that J.S.'s foster family was adversarial and pushed for adoption. But the record does not support this claim. The foster family mentioned they were an adoptive resource early in the case. But Foster Mother also testified when J.S. called her "mom," she would "sit down and explain to him that we're not his mom and dad, that he was our foster son, and we're here to keep him safe." The case workers also testified they did not feel the foster family was trying to prevent reintegration efforts.

The district court found Father had failed to provide a safe living environment for J.S. before he went into custody. The court noted Father was convicted of domestic battery of Mother. The court added: "Although [Father] knew [Mother's] propensity to explode in a violent rage and engage in physical[ly] abusive behavior, [F]ather did nothing, and continued to place the vulnerable child in the care of [M]other." The district

9

court found this lack of action by Father violated K.S.A. 2017 Supp. 38-2269(c)(1) by failing to do more to protect J.S.

The record supports the district court's findings. When J.S. came into State custody, he:

- "Appeared malnourished";
- Would only eat crackers and water, it was hard to get him to eat anything else;
- His behavior suggested a lack of structure in his life;
- Was developmentally delayed and needed speech therapy;
- Needed three of his teeth removed and three others were capped because of their condition;
- Witnessed his Mother and Father fighting and violence with each other.

Father points out as the case progressed he no longer had contact with Mother. But according to his own testimony, Father did not end his relationship with Mother out of concern for J.S.; he divorced her because she was cheating on him and insisted on having custody, not because he felt uncomfortable leaving J.S. in Mother's care, but because he wanted to keep J.S. away from Mother's fiancé. The record reflects Father was reluctant to terminate his relationship with Mother, even with the knowledge she was harming J.S.

Father also blames much of the family's instability on Mother, but the record also shows Father failed to take preventative action against Mother's behavior.

*Failure to maintain contact*

As for K.S.A. 2017 Supp. 38-2269(c)(2), the district court found Father was unfit under this factor in the journal entry. But at the termination hearing, the court held: "I'm

10

not gonna find that there was clear and convincing evidence of that. But there was evidence of that." K.S.A. 2017 Supp. 38-2269(a) requires courts to apply the clear and convincing evidence standard to findings of parental unfitness. Thus, we find this factor is not supported by clear and convincing evidence. Even with this factor removed, the district court's findings under the other two factors are supported by clear and convincing evidence. "The existence of any one of the above factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2017 Supp. 38-2269(f).

*Lack of effort to change*

Clear and convincing evidence must also support the district court's finding that the conduct or condition rendering Father unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). This court examines the term "foreseeable future" from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170. A district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion) ("Parental unfitness can be judicially predicted from a parent's past history.").

J.S. went into DCF custody at the age of four and had already spent over two years in custody by the time of the termination hearing. While Father obtained and maintained stable employment, he did not have appropriate housing and preferred to live at the Mission. He had failed to take advantage of the resources available to him through the agencies trying to help the family. His contact with case managers was hit or miss without explanation. Given Father's past conduct, the district court did not err in finding

11

Father was unlikely to change his conduct or condition to become fit in the foreseeable future.

*Best interests of the child*

Finally, Father argues the district court erred in finding termination of his parental rights was in J.S.'s best interests. Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1).

Because the district court hears the evidence directly, it is in the best position to determine the best interests of the child. *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). This court will not overturn that determination absent an abuse of discretion. 44 Kan. App. 2d at 318. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

Father first argues the district court made no clear finding on the record that termination of Father's parental rights was in J.S.'s best interests. However, the district court here specifically found termination of Father's parental rights was in J.S.'s best interests when considering J.S.'s physical, mental, and emotional health. Father's argument is not persuasive.

Father alternatively argues that even if he were unfit, termination "was not called for." He contends the district court ignored the bond between J.S. and himself. He also

claims "undue weight was placed on the child's unwillingness to be with his father, attributed to trauma."

The record shows the district court did not abuse its discretion in terminating Father's parental rights. When J.S. entered State custody, he was malnourished, developmentally delayed, and had behavioral problems. He had been exposed to violence, both between his parents, and between Mother and others.

For the first few months of the case, Father maintained regular visits and he interacted well with J.S. But at some point, visits with Father caused increasing behavioral problems for J.S. as well as regression in his speech. J.S. made it clear to his Father, counselor, and his caretakers he did not want to see Father. Once visits stopped, J.S.'s behavior improved, and J.S. had been unwilling to resume them.

J.S. is now seven years old. Father has made minimal progress during the two plus years this case has been pending. Based on the record, a reasonable person could agree that termination of Father's parental rights was in J.S.'s best interests.

Affirmed.