NOT DESIGNATED FOR PUBLICATION

No. 118,973

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Guardianship and Conservatorship of LOIS CRIST.

MEMORANDUM OPINION

Appeal from Anderson District Court; ERIC W. GODDERZ, judge. Opinion filed February 1, 2019. Affirmed.

Catherine A. Zigtema, of Zigtema Law Office LC, of Shawnee, for appellant Lois Crist.

Thomas H. Sachse, of Anderson & Byrd, LLP, of Ottawa, for appellees guardians/conservators.

Before ARNOLD-BURGER, C.J., LEBEN and BRUNS, JJ.

PER CURIAM: Any individual who has been adjudicated as impaired under Kansas law and has had a guardian or conservator appointed for his or her care can petition the district court to have his or her capacity restored. If the district court does not find, by clear and convincing evidence, that the individual is impaired, the court is required to restore the person to capacity and terminate the guardianship or conservatorship, or both.

Members of Lois Crist's family filed a petition to have them appointed as guardians and conservators for Crist because of Crist's inability to care for herself or her estate. Crist stipulated to the need for a guardianship and conservatorship. Crist lived at a nursing home for a time and eventually moved to an assisted living facility. After Crist's relationship with her guardians and conservators became strained, she filed a petition to restore capacity with the district court. After a full hearing, the district court found that clear and convincing evidence existed to show that Crist remained an impaired person as

1

defined by statute. The district court denied Crist's petition. Crist appeals arguing that the district court erred in its ruling and erred by failing to sua sponte order a change in who serves as Crist's guardians and conservators. Because we find the district court's decision was supported by clear and convincing evidence and Crist failed to properly preserve any claim to an order changing guardians or conservators, we affirm.

FACTUAL AND PROCEDURAL HISTORY

At the time the events giving rise to this action began, Crist was 82 years old and had been a widow for about 10 years. She is a college graduate and taught kindergarten for 17 years before retiring. She lived alone on rural farmland outside of Garnett, Kansas. Her son Mike and his wife lived about a mile away. Her other children lived over 150 miles away.

In approximately September of 2014, Karen Terrill, Crist's daughter who lived over 150 miles away in Wichita, was notified by her sister-in-law, who lived close to Crist, that Crist's house had become uninhabitable and Crist's son and daughter-in-law were unable to assist her in the manner she needed. Terrill arranged a family gathering in December 2014. At that meeting, Crist would not allow the family into her home and insisted they meet somewhere for dinner. Upon arriving, Terrill was shocked by her mother's appearance. She was dirty and unkept. She was walking with a cane and had a hard time remaining steady on her feet. In March 2015, Terrill again received a phone call from her sister-in-law, who lived nearby, that she and her family were going to be out of the country for an extended period, and Crist was very ill and needed to see a doctor. Crist was taken to the doctor who told the family that Crist should not be living on her own.

Terrill began visiting care facilities with her mother and suggesting other alternatives like Meals on Wheels and hiring people to help and conduct repairs on her

home. But Crist would not make any decisions. Terrill then noticed that Crist's health was continuing to deteriorate. She was not making sense when they spoke on the phone. So Terrill and other family members decided to intervene by filing a petition for an ex parte emergency order to appoint a temporary guardian and conservator for Crist with authority to admit her to a treatment facility.

The original petition, filed in May 2015, alleged that Crist was unable to walk, had diminished fine motor control, was incontinent, could not manage personal hygiene, could not feed herself, suffered decreased cognitive functioning, and was generally unable to provide for her own care and well-being. Because of the allegations in the petition, the court authorized the coguardians to remove Crist from her home and admit her into a hospital, nursing home, or assisted living facility. Crist was removed by ambulance from her home which was found to be in a deplorable condition as evidenced from photos taken and shown to the district court. The home appeared to be that of what we commonly refer to as a hoarder. Debris, filth, and mold were everywhere. Crist had basically been living on her sofa. There was both human and cat excrement on the floor. Unfilled prescriptions were found hanging on the shelf. There was mold growing on Crist's dentures. It was later determined by inspection that mold was so prevalent in the house that it was unsafe for human habitation until after it had been remediated at a cost of about $65,000. Due to a long period of lack of attention, the house was unsanitary, unsafe, and unlivable.

After arriving at a medical facility, it was determined that Crist had a urinary tract infection and a vitamin B-12 deficiency that both required treatment. Following the resolution of Crist's immediate medical needs she was placed in a nursing home. Her physical condition stabilized while at the nursing home, although she continued to be treated for multiple urinary tract infections.

3

Crist later waived her right to a trial, admitted the allegations in the petition, and consented to the entry of a permanent guardianship/conservatorship in August 2015. The court appointed Terrill; Connie Scott, Crist's stepdaughter; Lela Scheckel, Crist's daughter; and Lela's husband Gene Scheckel as Crist's coguardians and coconservators.

As to Crist's financial affairs, she was secretive with the conservators regarding the location of her accounts, as well as income and expenses. It turns out that she had a significant estate that her husband had managed before his death. Although she signed monthly expense checks, financial matters were never her strength. It appears that for some time prior to the conservatorship her daughter-in-law, who lived close by, was filling out her checks for monthly expenses and simply having Crist sign them. She was not behind on any of her bills, but she had not filed her taxes. After her husband's death, she received the help of a financial advisor. The total value of the estate at the time of the appointment was approximately $1.46 million. She had income from numerous sources including social security, teacher's pension, veteran's benefits, pasture rental, crops, government subsidies, long-term care insurance payouts, investments, and annuities. Throughout these proceedings, she had no complaints concerning how the conservators had handled her finances.

In January 2017, the guardians and conservators submitted a report to the court covering the time from May 2015 to December 2016. The report summarized what had been happening since Crist had been removed from her home.

Although the guardians lived at least 150 miles from Crist, at least one guardian visited Crist an average of once a month. Each guardian kept in contact with Crist through letters, cards, and phone calls. The report indicated that Crist was treated for a urinary tract infection, had her dentures repaired, corrective lenses updated, and was receiving physical therapy to help her gain strength and improve her motor skills. The nursing home staff taking care of Crist regularly took Crist to the local library, Wal-Mart,

4

and to visit her homebound son who lived nearby. The report also indicated that Crist was more alert and social than she had been when the initial petition was filed. But the report stated that "she continues to demonstrate poor judgment on decision making, financial matters and interpersonal relationships." Additionally, Crist was upset with the guardians and conservators because she did not want to be placed in a nursing home. Because of Crist's behavior during meetings, nursing home staff was present in meetings relating to financial matters.

In April 2017, Crist filed a petition for restoration to capacity. Crist asserted that she was no longer impaired because the original source of her impairment was due to an altered mental state caused by her urinary tract infection which had since been treated. Crist's petition did not express any issues with her guardians or conservators, nor did it request that her guardians or conservators be replaced if her petition for restoration to capacity was denied. An evaluation by Dr. William Blessing was included with the petition.

Dr. Blessing's evaluation states, in part, that Crist scored 2.1 standard deviations below the mean in the Trails B test. The Trails B test is described in another evaluation (discussed more fully later) as testing an individual's ability to switch response sets when required. The example used to describe what this might impact was driving, a task which requires constant switching of attention. Dr. Blessing scored Crist's ability to manage money and health and safety as high. He indicated that Crist had the capacity to meet essential needs for physical health, safety, or welfare, and had the capacity to manage her estate. Dr. Blessing summed up his evaluation with:

> "Testing sensitive to independent living skills related to money management and health
> and safety were performed at the above average level. The results of neuropsychological
> evaluation indicates this patient is capable of expressing her wishes and remembering

them. The normalcy demonstrated in both intellect and memory processing indicates she clearly meets legal criteria for competence."

The guardians and conservators filed written defenses to Crist's petition stating that Crist was still in need of guardians and conservators. They also requested another evaluation of Crist. The district court ordered another evaluation.

Dr. Martin Zehr performed the additional evaluation on Crist. Dr. Zehr's report indicated that Crist believed her home was in good condition when she left, a belief unsupported by the record. Crist told Dr. Zehr that there were no problems at the house and that she had a "'cleaning lady hired to come in.'" Crist made other statements that Dr. Zehr believed were unsupported by staff at the facility where Crist was living. Crist tested in the severely impaired range on the Trails B test. In Dr. Zehr's opinion, Crist did not have an accurate recollection of her living conditions before the original petition and her responses to questions regarding the availability of assistance were she to live at home were unrealistic assessments of her ability to live alone. Ultimately, Dr. Zehr believed that Crist lacked the "capacity to manage her estate or to meet essential needs for nutrition, health, safety or welfare without supervision and regularly-available assistance and that, therefore, she is in need of a guardian and conservator."

In response, Crist had another evaluation completed by Joann Peine, a clinical social worker. Peine's report indicated that Crist functioned well cognitively and did well with many tasks of daily living. Peine did note that Crist appeared to have trouble with laundry, housekeeping, and transportation. Peine believed that Crist had the capacity to meet essential needs for physical health, safety, or welfare and had the capacity to manage her estate.

The district court held a hearing on Crist's petition. By the time of the hearing, Crist had been moved into an assisted living facility which provided her more freedom.

6

She was happy there. All three evaluations prepared for the hearing were admitted without additional testimony from the authors. Crist testified at the hearing and discussed her land and the home on it. She testified that she was previously ill but had not been aware of how serious the illness was. She acknowledged that she was bedridden due to the illness and the house had fallen into a state of disrepair. Crist also stated that she had moved from a nursing home to a less restrictive assisted living facility and liked it there. She acknowledged that if she were to return home she would need help with transportation, laundry, and other general housework. She also testified that she wanted to move back home but agreed that moving back to her house at the time of the hearing was not a good idea.

Crist claimed that she did not know that there was anything unsafe or unclean about the inside of her home before she was appointed guardians and conservators. When asked about whether she continued to suffer from urinary tract infections Crist seemed uncertain. Moreover, Crist said she probably would not have as much trouble handling her financial affairs as "just caring for myself." She did not have an estimate for how much her estate was worth without reviewing the documents regarding her finances, which she had not seen in 2017.

The district court asked Crist why she thought she did not need guardians. Crist replied that because there were four guardians it took them too long to reach any decisions and when they did she did not agree with the decision, although she could not provide an example. She was further asked if she thought she needed just one instead of four, and she replied that she didn't need any.

Terrill testified and the pictures of Crist's home at the time Crist was removed were admitted into evidence. She testified regarding everything leading up to the removal, the costs of getting the home into a livable condition, and the fact that that home healthcare for Crist would be more expensive than Crist living at an assisted living

facility. Terrill also stated that she and the other guardians and conservators did not have disagreements and that decisions were made in a timely manner. According to Terrill, financial information was provided to Crist quarterly. The information was distributed through paper rather than in person because of Crist's behavior at in-person meetings.

Gene Scheckel testified that as a guardian and conservator he mainly handled Crist's financial matters. He testified that he was able to get her assets under control and the various steps he had taken to protect and conserve her assets. He also pointed out that he did not charge the estate for any of his work. Even though she had significant nursing home and medical expenses, her assets started out at $1.46 million in May 2015 and as of the date of the hearing in November 2017 her assets were $1.43 million. He did not believe that Crist had "any clue of what—what's going on and how much of an effort it is to get all these things done and bills paid on time." He indicated the family was thrilled that she had gone from near death to the least restrictive setting possible in assisted living.

The district court ultimately denied Crist's petition for restoration to capacity. The court found that there was clear and convincing evidence that Crist still was impaired with regards to taking care of her own health, safety, and finances. The court expressed concern about Crist's health due to Crist's age and what happened to her in the past when she was left to her own devices. The court was concerned that Crist was, and would be, unable to get around by herself. The court reasoned that while Crist was in the assisted living facility she was receiving the 24-hour assistance that she needed. And while Crist professed that she was content to remain in assisted living, the court noted that if the guardianship was removed there was nothing to stop her from making an irrational decision and moving back to her rural home, even though it was not livable.

As for the financial side, the court believed that managing her estate was beyond her capacity because she did not "even know the amount of money that [she was]

8

receiving on a monthly basis." Nor did she know the total value of her estate or how to handle her financial affairs so that the estate was not squandered. The size and complexity of her estate was well beyond Crist's capabilities.

The court discussed the evaluations admitted as evidence. The court noted that Dr. Blessing's evaluation seemed "to be more of a competency evaluation" not aimed at whether Crist could care for herself and manage her own finances. The court looked at the conflicting conclusions between Dr. Zehr's report and Dr. Blessing and social worker Peine and found Dr. Zehr's more persuasive. The court also found that Crist's living at the assisted living facility was not an alternative to a guardian or conservatorship because the living situation was setup by the guardians and conservators. Neither party raised any other issues at the conclusion of the hearing. Crist appeals the district court's ruling.

ANALYSIS

The law regarding the appointment of guardians or conservators is entirely statutory and provides that any person may file "a verified petition requesting the appointment of a guardian or a conservator, or both, for an adult with an impairment in need of a guardian or conservator, or both." K.S.A. 2017 Supp. 59-3058(a)(1). If the court finds by clear and convincing evidence that the person is an adult with an impairment in need of a guardian or a conservator, the court is required "to appoint a qualified and suitable individual or corporation as the guardian or conservator, or both." K.S.A. 2017 Supp. 59-3067(e)(1).

The term "[a]dult with an impairment in need of a guardian or a conservator, or both" is defined as:

> "a person 18 years of age or older . . . whose ability to receive and evaluate relevant information, or to effectively communicate decisions, or both, even with the use of

9

assistive technologies or other supports, is impaired such that the person lacks the capacity to manage such person's estate, or to meet essential needs for physical health, safety or welfare, and who is in need of a guardian or a conservator, or both." K.S.A. 2017 Supp. 59-3051(a).

In other words, if a person is deemed by a court to be impaired, state law allows the court to take away the person's right to control his or her own destiny. The court then appoints a surrogate to make decisions and to act in the person's stead. Laws such as this are based upon the long-standing legal doctrine of *parens patriae*, which empowers the State "to enact legislation regarding the welfare of those unable to care for themselves." *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, Syl. ¶ 4, 877 P.2d 430 (1994).

But impairment is often not a permanent condition. People can recover and no longer need a surrogate. So, in Kansas, after being adjudicated as an adult with an impairment in need of a guardian or a conservator, the individual may file a petition to restore capacity. K.S.A. 59-3090. If the court determines that good cause exists to warrant further proceedings on the petition a hearing is held. K.S.A. 59-3090(c)(1). After conducting a hearing on the petition "if the court does not find, by clear and convincing evidence, that the ward or conservatee is impaired, the court shall order that the ward or conservatee is restored to capacity and shall proceed to terminate the guardianship or conservatorship, or both." K.S.A. 59-3090(h).

This appears to create a two-tiered system. The petitioner first has the burden of submitting a prima facie showing "to warrant further proceedings on the petition." K.S.A. 59-3090(c)(1). In other words, the petitioner must put forward some evidence that he or she is no longer impaired. In this case, that evidence was Dr. Blessing's report which was attached to the petition. The burden then shifts to the respondent to show by clear and convincing evidence, just as in the original petition requesting the guardianship or conservatorship, that the petitioner is still impaired. This two-tiered system recognizes

the important safeguards that should be in place whenever deprivation of an individual's right to control his or her own destiny—a constitutionally protected liberty interest—is at stake.

Here, once Crist presented evidence that she was no longer impaired, the guardians and conservators bore the burden to show by clear and convincing evidence that Crist remained impaired and required their protection. See K.S.A. 59-3090(h). So Crist first argues that they did not meet their burden of establishing her continued impairment by clear and convincing evidence.

*There was clear and convincing evidence for the district court to find that Crist was impaired and in need of a guardian or conservator as defined by K.S.A. 2017 Supp. 59-3051(a).*

Clear and convincing evidence is evidence "sufficient to establish that the truth of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. 686, 696, 187 P.3d 594 (2008). In reviewing such a finding by the district court, we must review all the evidence in the light most favorable to the prevailing party, in this case the guardians and conservators. We are not allowed to weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705. We will begin with the evidence supporting a guardianship.

*Guardianship*

In order for the district court to find an individual is an adult with an impairment in need of a guardian the court must find that the individual lacks capacity to "meet essential needs for physical health, safety or welfare, and who is in need of a guardian." K.S.A. 2017 Supp. 59-3051(a). "'In need of a guardian'" is defined as "a person who because of both an impairment and the lack of appropriate alternatives for meeting

11

essential needs, requires the appointment of a guardian." K.S.A. 2017 Supp. 59-3051(f). In order to "'[m]eet essential needs for physical health, safety or welfare'" the individual must be capable of "making those determinations and taking those actions which are reasonably necessary in order for a person to obtain or be provided with shelter, sustenance, personal hygiene or health care, and without which serious illness or injury is likely to occur." K.S.A. 2017 Supp. 59-3051(i).

In this case, there was clear and convincing evidence to support the district court's decision that Crist remained an adult with an impairment in need of a guardian. Crist's needs were being met at the assisted living facility by 24-hour care, but as the court noted that is not an alternative to the guardianship, it resulted from the guardianship. Crist insisted that she did not know there was anything unsafe or unclean about her home before she left. The record is clear that the home was uninhabitable when the guardianship was created. She told Dr. Zehr that she did not think she would need any help living in her rural home. Crist blamed the initial situation at the home on her urinary tract infection. According to Dr. Blessing's evaluation, Crist continued to suffer from urinary tract infections while at the nursing home. Crist admitted that she remained under the care of an urologist. Moreover, the condition of the home appeared to result from long-term neglect, not a singular event. Her health had deteriorated to the point that she had to be removed from her home by ambulance. She admitted she did not realize how sick she was. She apparently lacked the capacity to recognize her situation in terms of illness or hygiene or have the cognitive ability to seek help. Her house had a serious mold problem that she failed to recognize which made it unsafe to even enter for a home study. She was unable to fill her prescriptions. She remains wheelchair bound. She does not have the mental capacity to complete tasks like driving. She must rely on others for transportation.

While Crist told the district court judge that she had no complaints about how her conservators dealt with her financial situation, she told Dr. Zehr that her children were

"trying to steal her blind" and she told Dr. Blessing that she was concerned that her children were spending her money excessively. She seemed to have problems remembering her daily activities, as she told Dr. Zehr that she was inactive, but staff at the nursing home reported she kept very active. While there were competing evaluations in this case, the district court found Dr. Zehr's evaluation more credible regarding her current lack of capacity and we do not reweigh that determination.

Crist counters that the language in K.S.A. 2017 Supp. 59-3051(i) refers to a present ability to "obtain or be provided with shelter, sustenance, personal hygiene or health care, and without which serious illness or injury is likely to occur." She asserts that the district court incorrectly speculated about her future impairment rather than focusing on her current capacity and that there was insufficient evidence to support a finding that she was currently impaired. Crist argues that her needs are being met while she resides at the assisted living facility which is essentially an appropriate alternative for meeting her needs and, therefore, she no longer requires a guardian.

The language of the statute allows the district court to consider whether a person is capable of "meeting essential needs." K.S.A. 2017 Supp. 59-3051(f). The individual must not only be able to meet those needs on the day of the hearing, he or she must be capable of "meeting" the needs in the future. Allowing the court to consider only the individual's capability on the day of the hearing is an unrealistic and unworkable standard. Conditions that may result in guardianships being created, such as Alzheimer's disease, have various levels of impact on an individual on a day-to-day basis. A district court must consider the whole picture when deciding whether someone needs a guardian. Limiting the court to a snapshot of what may be an atypical day for an individual is unreasonable.

Without the guardianship there is nothing to stop Crist from moving. And contrary to Crist's assertion that "[t]here was no testimony presented that she wished to return home to her rural farm," Crist testified that she had told Dr. Zehr, while living at the

13

nursing home, that she would like to move home. At the hearing she said, "I just would like to move back home. It is my home." As Dr. Zehr stated, Crist did not have an accurate recollection of her living conditions before the original petition and her responses to questions regarding the availability of assistance were she to live at home were unrealistic assessments of her ability to live alone, particularly in a rural area. Ultimately, the district judge found Dr. Zehr to be credible when he opined that Crist lacked the "capacity to manage her estate or to meet essential needs for nutrition, health, safety or welfare without supervision and regularly-available assistance and that, therefore, she is in need of a guardian and conservator."

Ultimately, since this court does not reweigh the evidence presented to the district court, there was clear and convincing evidence that Crist remained impaired and needed a guardian. See *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010).

*Conservatorship*

In order to find that an individual is an adult with an impairment in need of a conservator, the court must find that the person "lacks the capacity to manage such person's estate." K.S.A. 2017 Supp. 59-3051(a).

> "'Manage such person's estate' means making those determinations and taking those actions which are reasonably necessary in order for a person to receive and account for personal or business income, benefits and property, whether real, personal or intangible, and except for reasons of indigency, to purchase or otherwise obtain necessary goods or services, to pay debts and expenses, to sell, exchange or otherwise dispose of property, and to plan for future accumulation, conservation, utilization, investment, and other disposition of financial resources." K.S.A. 2017 Supp. 59-3051(h).

Crist makes the same arguments regarding the conservatorship as she did for the guardianship. The same general analysis applies here as well. That said, the statutory

14

language regarding the management of a person's estate is more explicit that the future should be considered than meeting essential physical health, safety, or welfare needs. See K.S.A. 2017 Supp. 59-3051(h), (i). The conservatee must be able to "plan for future accumulation, conservation, utilization, investment, and other disposition of financial resources." K.S.A. 2017 Supp. 59-3051(h). This necessarily requires the court to consider the future ability of the conservatee to make those plans.

Competing evidence was admitted at the hearing. Dr. Blessing's report indicated that Crist's "independent living skills related to money management . . . were performed at the above average level." Dr. Zehr's opinion stated that Crist was not capable of managing her estate. Crist was unable to estimate what her estate was worth. Although evidence was presented that Crist's finances were in good shape at the time of the initial proceeding, there was testimony that she was simply signing checks that her daughter-in-law wrote and had no appreciation for the size of her estate or the action necessary to preserve it.

Again, this court does not reweigh the evidence. In this case, the conservators presented sufficient evidence to support the district court's decision that clear and convincing evidence existed that Crist remained an adult with an impairment in need of a conservator. See *In re Adoption of B.B.M.*, 290 Kan. at 244.

*Crist failed to preserve any claim of error for failure to appoint an alternative guardian and conservator.*

If the court does not restore a ward or conservatee to capacity the "court shall make such further orders in the guardianship or conservatorship, or both, as may be appropriate under this act." K.S.A. 2017 Supp. 59-3090(h). Crist argues, for the first time on appeal, that the court erred when it did not, sua sponte, order a change to her guardians

or conservators. The guardians and conservators respond that Crist did not raise the issue below and cannot raise the issue now. We agree.

Issues not raised before the trial court cannot be raised on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the following: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008).

Crist does not acknowledge, in either her appellant brief or her reply brief, her failure to raise this issue before the district court or otherwise argue that any of the exceptions apply to justify our consideration of the issue. Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34) requires an appellant to explain why an issue not raised below should be considered for the first time on appeal. Litigants who fail to comply with this rule risk a ruling that the issue is improperly briefed, and the issue will be considered waived or abandoned. *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014); see *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015) (holding that Rule 6.02[a][5] is to be strictly enforced). Moreover, issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). Because Crist provides no justification for this court to consider, for the first time on appeal, the district court's failure to appoint a new guardian or conservator, we decline to consider the issue.

We do note, however, that Crist's claim also fails for two additional procedural reasons.

First, "litigants and their counsel bear the responsibility for objecting to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct such inadequacies, and, when there is no objection, omissions in findings are not considered on appeal." *State v. Jones*, 306 Kan. 948, 958-59, 398 P.3d 856 (2017). When there is no objection to a trial court's findings, this court presumes that the trial court found all facts necessary to support its judgment. 306 Kan. at 959-60. The district court read the statute above at the conclusion of the hearing. The court did not enter other orders, presumably because it did not believe that other orders were "appropriate under [the] act." Crist did not object to inadequate findings of fact and conclusions of law, so this also prevents us from considering them on appeal.

Second, K.S.A. 59-3087 provides a mechanism for someone, including the ward or conservatee, to seek a change in guardians or conservators. If Crist is unsatisfied with her guardians and conservators she was free to add that to her petition or file a separate action seeking such change. She did neither. Crist offers no support for her argument that the district court has an obligation to make a sua sponte order that would fundamentally change the guardianship or conservatorship. Nor does Crist explain how the district court was supposed to decide without hearing evidence that specifically addresses that issue. Crist testified that she had no complaints concerning how the conservators had handled her finances. When asked by the court if she wanted fewer than four guardians and conservators—due to her complaint that it took too long for four of them to agree to anything—she responded that she didn't need *any*. Neither Crist nor her counsel ever requested a change of the guardians or conservators other than restoring her capacity so that she would no longer need any. Instead, Crist added several documents to the record on appeal in an attempt to show that the guardians and conservators should be, if not removed, replaced. None of these documents were considered by the district court prior to the decision in this matter. They were all filed in the district court long after the notice of appeal had been docketed. Accordingly, they are not properly before us and we caution

17

counsel against future abuse of the rules by placing information before us that was not presented to the district court.

*The estate is responsible for reasonable attorney fees associated with this appeal.*

Finally, Crist requests that the court order the estate to pay Crist's attorney fees on appeal under the authority of K.S.A. 59-3063(a)(3) (appointment of attorney required for potential ward or conservatee when initial petition filed), K.S.A. 59-3090(f)(1) (appointment of attorney required in case of request to restore capacity), Supreme Court Rule 7.07(a)(4) (2019 Kan. S. Ct. R. 50) (court may apportion fees and expenses among the parties), and Supreme Court Rule 7.07(b)(1) (court may award attorney fees in any case in which the district court could do so). An examination of those provisions is in order.

The award of attorney fees against an estate is not discussed in either statute cited by counsel although they both require appointment of counsel for the ward or conservatee, ergo somehow the attorney must be paid. Moreover, the case cited by Crist, *In re Estate of Holder*, 168 Kan. 657, 215 P.2d 166 (1950), concludes that an attorney who brings an action in good faith on behalf of a ward or conservatee to restore capacity may be entitled to payment from the estate even though the guardian did not authorize the litigation on the ward's behalf.

The guardian in *Holder* argued that because the ward has no authority to contract on his or her own behalf, the ward cannot contract for legal services. Accordingly, no action to restore capacity could be brought without the consent of the guardian. But the court found that the statute at the time, G.S. 1947 Supp. 59-2268, provided that "'[a]ny person who has been adjudged insane or incompetent as herein provided, or his guardian, or any other person interested in him or his estate may petition the court in which he was so adjudicated or to which the venue has been transferred to be restored to capacity.'" 168

18

Kan. at 660. The Supreme Court interpreted this provision to mean that because the action could be brought by any interested person, and the attorneys were interested persons, the attorneys should be paid from the estate to give the statute any meaning.

> "The statute thus confers authority on the incompetent person to petition the court to be restored. It also bestows that power on any person interested in him. We cannot say from this record that the two attorneys who made the claim for fees in this case were not interested in Anna C. Holder. There is no doubt about the meaning of the above provision. If the legislature had intended the proceedings to restore an incompetent could only be brought by the guardian or with the consent of the guardian, then it would not have made the provision that the petition might be brought by any person interested in the incompetent. This provision carries with it by implication that a lawyer who files such a petition and presents it to the probate court may be paid from the estate of the incompetent. That is undoubtedly what the legislature intended when it enacted such broad authority to file such a petition. Should we hold in conformity with the argument of the guardian here, no lawyer could undertake such a proceeding except on a contingent basis unless he were paid by some person interested in the incompetent. We cannot read such an intention from the provisions of this statute." 168 Kan. at 661.

The court went to on to caution:

> "This is not to say that in every case brought to restore a ward to competency, counsel may be reimbursed out of the assets of the estate. Every case will depend upon its own surrounding facts and circumstances. Here the probate court of Sedgwick county heard the proceedings in the first place, the same court heard the application for allowance of attorney fees and other expenses incident to the restoration hearing and would have been the court to pass upon whether or not the action should have been brought in the first place had the proceeding contended for by the guardian have been followed. The value of the services as well as the good faith of the lawyers is conceded." 168 Kan. at 662.

There have been no other cases dealing with the assessment of attorney fees against an estate for motions to restore capacity. We note that in 2002 the statute was

19

changed to provide that "[t]he ward or conservatee may at any time file a verified petition with the court requesting that the court find that the ward or conservatee is no longer impaired, and request that the court restore the ward or conservatee to capacity." K.S.A. 59-3090(a). The language relied on in *Holder* that *any interested person* could pursue an action to restore capacity no longer appears in the statute. We note that the *any person* language does appear in K.S.A. 59-3091(a) ("At any time following the appointment of a guardian or a conservator, *any person*, including the ward or conservatee, may file a verified petition with the court requesting that the court find that the ward or conservatee is no longer in need of a guardian or a conservator, or both, and requesting that the court terminate the guardianship or conservatorship, or both." [Emphasis added.]).

Nevertheless, we agree with the analysis of the Supreme Court in *Holder* that if the Legislature had intended the proceedings to restore competency could only be brought by the guardian or with the consent of the guardian, then it would not have made the provision that the petition might be brought by the ward. In addition, the award of attorney fees against the estate is not a foregone conclusion in every case. But in this case, as in *Holder*, the district court ordered the costs associated with the appeal be paid out of the estate and the estate did so. The Appellees (guardians and conservators) do not object to such a course of action, they simply argue that this court should examine whether the fees requested are reasonable. Like the district courts, appellate courts are experts on the reasonableness of attorney fees. *Link, Inc. v. City of Hays*, 268 Kan. 372, 382-83, 997 P.2d 697 (2000).

Counsel for Crist requests that in addition to the $2,500 already awarded by the district court for counsel's retainer on appeal, she has generated an additional $5,720 in attorney fees preparing the appeal. Appellees objected to the lack of detail in the first invoice submitted by counsel for Crist. A supplemental affidavit and invoice was submitted that appears to address those concerns. The only remaining specific objection that the Appellees have to the invoice is a telephone call in July 2018 to the

20

"ombudsman" who was not a party to this appeal. Indeed, it would appear that this expense may be related to subsequent filings that counsel improperly attached to her brief that did involve the long-term care ombudsman.

Crist filed a notice of appeal on December 7, 2017. Crist's brief was filed July 17, 2018. Appellees' brief was filed in this matter on September 13, 2018. On September 19, 2018, counsel for Crist filed a request for additions to the record on appeal to include information that was not part of the case at the time of the appeal, but involves disputes that occurred in August 2018 concerning the involvement of the long-term ombudsman. Counsel included these documents in her reply brief in a clear attempt to bolster her position that the guardians and conservators should have been removed and substitutes appointed. Moreover, although she filed a reply brief, counsel failed to state any authority in her reply brief for her position that the court was required to consider replacement of the guardians or conservators sua sponte. As a result, after a complete review of the invoices provided to the court, we order that the estate be responsible for an additional. $4,570. This excludes any fees generated for preparation of the reply brief and it also excludes discussions with the long-term care ombudsman on July 5, 2018.

The decision of the district court denying Crist's petition for restoration of capacity is affirmed and Crist's motion that attorney fees on appeal be paid by the estate is granted in the sum of $4,570.